USDC SCAN INDEX SHEET

















GEP    11/10/04    11:42

3:04-CV-02248   NICKEL LTD V. PURE BIOSCIENCE

*1*

*CMP.*

1  Joel S. Seidel, SB #175275
   10325 Aldea Avenue
2  Granada Hills, CA  91344
   Tel: (818) 832-7850
3  Fax: (818) 832-7889

4  Attorney for Plaintiffs

**FILED**

04 NOV -9 PM 3:07

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

5

6

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10                              '04 CV 2248   BEN (RBB)
    NICKEL, LTD., and
11  FALKEN INDUSTRIES, LTD.,        CASE NO _____
    New Jersey corporations,      )
12                                )
                    Plaintiffs,   )
13                                )
    vs.                           )   **COMPLAINT**
14                                )
    PURE BIOSCIENCE,              )
15  f/k/a Innovative Medical Services,  )
    a California coroporation,    )
16                                )
                    Defendant.    )
17  _____)

18        Nickel, Ltd., and Falken Industries, Ltd., by their attorneys and for their complaint against

19  Pure Bioscience state the following:

20        1.    This action is brought for a declaration that plaintiffs Nickel and Falken are not

21  subject to arbitration of defendant Pure Bio's claims in the United States.

22        2.    Nickel, Ltd., is a corporation organized under the laws of New Jersey with its principal

23  place of business in Paris, France.

24        3.    Falken Industries, Ltd. is a corporation organized under the laws of New Jersey with

25  its principal place of business in Paris, France.

26        4.    Pure Bioscience, f/k/a Innovative Medical Systems or IMS, is a corporation organized

27  under the laws of California and has its principal place of business in California.

28

_____
                              Complaint

5.     This Court has federal question jurisdiction over the parties under the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, which authorizes the Court to determine the enforceability of an arbitration agreement and diversity jurisdiction under 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, as Pure Bio seeks $300,000 in damages in the arbitration at issue here against Nickel and Falken.

6.     Venue is proper in this district under 28 U.S.C. § 1391 as defendant resides here and the arbitration as to which plaintiffs seek a declaration is proceeding in this district.

7.     On or about June 23, 2004, Pure Bio filed a Statement of Claim with the AAA in San Diego, California, AAA No. 50 133 T 00319 04, seeking approximately $330,000 in damages against plaintiffs for alleged breaches of a license agreement, titled "Exhibit E to Umbrella Agreement by and between IMS and Nickel." A copy of the Statement of Claims is attached hereto as **Exhibit 1**.

8.     Plaintiffs were notified of the claim and the AAA assigned it for administration to its International Centre for Dispute Resolution division.

9.     The "agreement" under which Pure Bio seeks arbitration in San Diego is an unsigned exhibit to an executed agreement entitled "Umbrella Agreement." Pure Bio did not include the Umbrella Agreement as an attachment to its Statement of Claim. Accordingly, a copy of the Umbrella Agreement without additional exhibits is attached hereto as **Exhibit 2**.

10.    Pure Bio's arbitration is improper for several reasons, including the following:

(a)     Falken is not a purported party to and is not an assignee of the licensing agreement, Exhibit E to the Umbrella Agreement, under which Pure Bio purports to arbitrate and the alleged licensing agreement was not signed by either plaintiff. Accordingly there is no valid or enforceable agreement for arbitration in San Diego against either.

(b)     The arbitration agreement in the unsigned Exhibit E is directly contrary to the arbitration provision in the signed Umbrella Agreement to which Exhibit E was attached and which provides in section 10.21 that any disagreement arising out of the agreement, which would include the license granted therein and the exhibits, must be "submitted to binding arbitration ... to be held in Stockholm, Sweden." As Pure

2

1    Bio's claims arise from the license granted in the Umbrella Agreement, its claims

2    must be arbitrated in Sweden pursuant to the arbitration provision in the Umbrella

3    Agreement.

4    (c)    The Umbrella Agreement provides in section 10.19 that if Pure Bio shall

5    "institute any legal or other proceeding in connection with or for the enforcement of

6    this Agreement in a United States jurisdiction, then in that event [Pure Bio]

7    specifically agrees that [the forum] is without subject matter jurisdiction and does not

8    have personal jurisdiction over Nickel . . . ."As Pure Bio's claims in arbitration are for

9    breach of the license granted in the Umbrella Agreement, this proceeding was

10    instituted "in connection with . . . [the Umbrella] Agreement.  Accordingly, by Pure

11    Bio's express agreement, the AAA has no jurisdiction over Nickel.

12    (d)    Even if the arbitration provision in the unsigned Exhibit E was valid, the

13    arbitration provision in the negotiated and signed Umbrella Agreement would in any

14    event control over the conflicting provision in the unsigned Exhibit E.

15    11.    Counsel for Nickel notified the AAA by letter dated July 28, 2004, that arbitration of

16    Pure Bio's claims in the United States was improper for the foregoing reasons.

17    12.    On August 19, 2004, the AAA notified Nickel's counsel that "pursuant to Article 15

18    of the Commercial Arbitration Rules in effect, the tribunal shall have the power to rule on its own

19    jurisdiction" and "[a]bsent the parties' agreement or an order from the court or the tribunal, we will

20    proceed with the administration of this matter."

21    13.    Thereafter, the AAA appointed an arbitrator and set a preliminary conference date.

22    14.    As there is no valid and enforceable arbitration agreement with plaintiffs providing for

23    arbitration of Pure Bio's claims in the United States, plaintiffs are entitled to a judgment declaring

24

25    that the AAA does not have jurisdiction to proceed with arbitration no. 50 133 T 00319 04 against

26    plaintiffs.

27    15.    There is an actual controversy between the parties concerning whether Pure Bio's

28    claims can be arbitrated by the AAA in the United States.

3

---

**Complaint**

1    WHEREFORE, plaintiffs Nickel, Ltd. and  Falken Industries, Ltd. request that this

2    Court (a) enter a judgment declaring that Nickel and Falken are not parties to an arbitration

3    agreement providing for the arbitration in the AAA in the United States of Pure Bio's claims asserted

4    in arbitration no. 50 T 133 00528 03, (b) award Nickel and Falken their costs, in addition to their

5    attorney's fees as provided in Section 10.19 of the Umbrella Agreement, and (c) grant such further

6    relief as it deems just.

7

8                                                 NICKEL, LTD.

9                                                 FALKEN INDUSTRIES, LTD.

10

11   By _____

12   Joel S. Seidel, SB #175275                        Its Attorney
     10325 Aldea Avenue
13   Granada Hills, CA  91344
     Tel: (818) 832-7850
14   Fax: (818) 832-7889

15   Dated:   November 2, 2004

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    4

**Complaint**

# AMERICAN ARBITRATION ASSOCIATION
## SAN DIEGO

**RECEIVED**

JUN 23 2004

AMERICAN ARBITRATION
SAN DIEGO

PURE BIOSCIENCE
(formerly known as
INNOVATIVE MEDICAL SERVICES)[1],
a California corporation,

        Claimant,

v.

NICKEL, LTD., a New Jersey corporation;
FALKEN INDUSTRIES, LTD.,
a New Jersey corporation

      Respondents.

CIVIL MATTER NO. _____

ARBITRATOR:    TBA
Pursuant To Article 7(2), Commercial Arbitration Rules [A.A.A.]

# STATEMENT OF CLAIMS

   Claimant PURE BIOSCIENCE (formerly known as "INNOVATIVE MEDICAL SERVICES"), a

California corporation, for claims as and against the named Respondents, and each of them,

asserts the following Claims:

    **A.**      **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS.**

      **1.**    **The Parties To The Arbitration.**

   1.    Claimant PURE BIOSCIENCES (referred to hereinafter alternatively as

"INNOVATIVE", or "PURE-BIO") is a publicly-traded company, whose publicly-held shares trade

"over the counter" on the OTC Bulletin Board under the stock symbol "PURE", subject to

Securities Act of 1933 (15 U.S.C. § 77a, et seq.) and the Securities Exchange Act (15 U S.C. §

78a, et seq.), both of which are administered and enforced by the Securities and Exchange

Commission ("S.E.C.").

---

[1]   On 6 October 2003, by its filing of a Certificate of Amendment in the office of the California Secretary of State, INNOVATIVE MEDICAL SERVICES formally changed its name to "Pure Bioscience".

Exhibit 

2.      NICKEL, LTD. ("NICKEL") is New Jersey corporation, duly organized and existing under and pursuant to the laws of the State of New Jersey with its principal place of business at 146 rue du Chateau, Paris, France, having established its European Regional Office "in early 1997".

3.      Claimant PURE BIO is informed and believes and thereon alleges that FALKEN, LTD. ("FALKEN") is New Jersey corporation, duly organized on or about 6 August 2003 and existing under and pursuant to the laws of the State of New Jersey with its principal place of business at 146 rue du Chateau, Paris, France.

4.      At all times mentioned herein, NICKEL represented and warranted to claimant PURE-BIO that European-based NICKEL was "dedicated to developing a range of products to serve the markets for cleansing products and their derivatives, principally in the automotive and industrial sectors (automobiles, trucks, body shops, factories and workshops)  and was "a leading (European) developer and manufacturer of industrial and consumer wipes and chemical products primarily for the automobile after-market". Furthermore, NICKEL represented and warranted to claimant PURE-BIO that NICKEL owned the Clean Plus© product group  -  an extensive line of products divided into two line segments: industrial (automotive, trucking, janitorial and sanitation and other diverse industries), and consumer (auto accessories), which NICKEL had "launched . . from two stands at the Equip Auto 1999 Tradeshow in Paris in October 1999".

5.      NICKEL further represented and warranted to claimant PURE-BIO that, based upon its extensive investigation, research and product development with considerable investment, NICKEL's CleanPlus® line constituted an extensive grouping of wet wipe products that was a market leader, and no alternative was available to compete with the breadth or depth of their CleanPlus® product line of high performance and quality products.

**2.      Licensing Agreement Between INNOVATIVE And FALKEN.**

6.      Based in major part upon NICKEL's representations and seeking a distributor to launch its Axenohl® patent technology in Europe, on 10 January 2003, INNOVATIVE and NICKEL, LTD. ["NICKEL"], a New Jersey corporation, with its principal place of business in Paris,

France entered into an Umbrella Agreement, pursuant to which the parties also entered into a License Agreement, a copy of which is marked Exhibit A, attached hereto and by this reference is incorporated herein.

      7.     Pursuant to the License Agreement, INNOVATIVE, "as the owner and/or assignee" of the Axenohl® patent and its related technology [collectively the "Licensed Technology"] granted to NICKEL certain "non-transferable limited licenses for the Licensed Technology and the respective Licensed Products", permitting NICKEL, on a non-exclusive basis "to use, sell and market the Licensed Technology" in a specifically defined Licensed Territory. *Exh. A, License Agmt.*

      8.     Pursuant to the License Agreement, NICKEL was granted two (2) separate licenses:

      (a)    a limited exclusive, *non-transferable* right and license to the Licensed Technology for Wet Wipe as Hard Surface Disinfectant/Cleansing products, permitting Wet Wipe manufacture, distribution, marketing and selling of Wet Wipe products utilizing the Licensed Products; and

      (b)    a limited exclusive, *non-transferable* right and license to the Licensed Technology for a Liquid and Spray as Hard Surface Disinfectant/Cleansing products only, permitting Liquid and Spray manufacture, distribution, marketing and selling of Wet Wipe products utilizing the Licensed Products.

      *p. 2, Exh. A, Lic. Agmt.*

      9.     In return for INNOVATIVE's grant of these licenses and as consideration for the rights conveyed, NICKEL agreed to pay to INNOVATIVE a licensing fee in the amount of

      "THREE HUNDRED THOUSAND Dollars ($300,000.00 USD), payable over a period of eighteen (18) months, in twelve (12) equal monthly installments in the amount of $25,000.00 USD, commencing on the seventh (7th) month from the anniversary date of the execution of the Agreement and continuing on a successive monthly basis through the eighteenth (18th) month from the anniversary date of the execution of this Agreement."

      *p. 3, Exh. A, Lic. Agmt.*

      10.    In addition to the payment of the licensing fee, NICKEL contractually obligated itself to take the following actions:

(a) "launch and market, on a commercially acceptable basis, at least one product in each Minor Field of Use within six months of the execution of this Agreement; *p. 3, Exh. A, Lic. Agmt.*

(b) "launch and market, on a commercially acceptable basis, at least a minimum line of products addressing the specific needs of each Minor Field of Use within one year"; *p. 3, Exh. A, Lic. Agmt.*

(c) "on a best efforts basis" to "use expedited reasonable efforts to design, produce, manufacture, market and sell the Licensed Products into the commercial market as soon as practicable." *p. 3, Exh. A, Lic. Agmt.*

(d) ". . . spend 5% of the gross revenues of the Licensed products on the marketing and advertisement of all Licensed Products within the Licensed Territory." *p. 3, Exh. A, Lic. Agmt.*

(e) ". . . report monthly on required expenditures for advertising and marketing" and examples of said advertising and marketing product"; *p. 3, Exh. A, Lic. Agmt.*

(f) " . . . provide written reports . . . quarterly within thirty (30) calendar days after the close of each fiscal quarter", stating with accuracy and in detail "the customer and number of Licensed Products sold and distributed during the preceding three (3) calendar months" with "certification from its Chief Financial Officer. . . " *p. 4, Exh. A, Lic. Agmt.* and

(g) "honestly, faithfully and strictly comply with all applicable federal, state and local laws", including securities laws. *p. 3, Exh. A, Lic. Agmt.*

11.    The Licensing Agreement expressly provides that it or any part thereof "may not be transferred or assigned by (NICKEL) without the written consent of INNOVATIVE." *p. 9, Exh. A, Lic. Agmt.*

> 3.    **The "In-Bred" Interconnected Relationship Between NICKEL And FALKEN, FALKEN's Acquisition Of NICKEL's CleanPlus® Product Line And NICKEL's Unauthorized Full And Complete "Assignment" Of Its Rights Under The Umbrella Agreement And The Licensing Agreement.**

12.    Recently, on or about 25 September 2003, INNOVATIVE was informed and advised in writing, on FALKEN letterhead, by Ms. Helle A. Madso, NICKEL's Vice President and FALKEN's Executive Vice President, that NICKEL's rights, title and interest under the Licensing Agreement have been fully and completely transferred and assigned to FALKEN and that FALKEN was the "assignee of Nickel, Ltd." as to all of NICKEL's rights under the License Agreement.

13. Shortly after, through a publicized Press Release, INNOVATIVE discovered that FALKEN had "recently acquired the Clean Plus® product group (http://www.cleanplus.corn)" and was now touting itself as "the leading manufacturer of high quality and innovative wet wipe specialty cleaning products in Europe". In addition, INNOVATIVE further discovered, through a "stock purchase solicitation" correspondence dated 13 October 2003 again promulgated by Ms. Helle Madso, NICKEL's Vice President and FALKEN's Executive Vice President, that FALKEN, a New Jersey corporation, formed on 6 August 2003 (i) "(wa)s a dynamic consumer and industrial goods manufacturer with a leading role in the market for innovative wet-wipe technology and time-tested marketing know-how for cleaning and hygiene products and accessories; that (ii) "FALKEN (had) recently acquired all of NVID's rights to the patent Axenohl® and that on August 28, FALKEN acquired from Nickel, Ltd. the Clean Plus® branded product group,(which) includes the Bac'Out® line of cleansing and disinfectant liquids and wet-wipes in which Axen®, the Axenohl® derivative will be incorporated"; and that (iii) "FALKEN fully expects to be producing and marketing its full line of Clean Plus® products, including the Bac'Out® products using Axen® in both North America and Europe no later than first half 2004.

14. Claimant PURE-BIO is further informed and believes and thereon alleges that respondent NICKEL is now controlled, dominated and operated by respondent FALKEN and its officers and directors in that all he activities and business of respondent NICKEL is now being carried out by respondent FALKEN and the same principals, shareholders, directors and officers involved in NICKEL and that controlled NICKEL now are the same principals, shareholders, directors and officers that are involved with FALKEN and that control FALKEN.

### B. ARBITRATION VENUE: SAN DIEGO

15. This action is filed in the County of San Diego, California, because the Licensing Agreement is internally defined as "self-executing" and specifically mandates that "(a)ll disputes and controversies related to this Agreement and the transactions contemplated by this Agreement whether sounding in tort or contract shall be determined exclusively by binding

mediation/arbitration ('med-arb') in accordance with the then current commercial dispute procedures of the American Arbitration Association and will be conducted only in the County of San Diego". Furthermore, the Agreement provides that "the (p)arties expressly submit to the jurisdiction of said San Diego arbitrator, and voluntarily waive any right to assertion of the principle of "inconvenient forum". *p. 6, Exh. A, Lic. Agmt. 6.*

### C.   CLAIMS AS AND AGAINST NICKEL AND FALKEN, ITS ASSIGNEE.

**CLAIM   NO. 1:**   **BREACH OF CONTRACT: FAILURE TO PAY LICENSING FEE AND FAILURE TO COMPLY WITH VARIOUS CONTRACTUAL OBLIGATIONS**

16.   Claimant PURE-BIO realleges and incorporates herein by reference each and all of the Factual Allegations hereinabove set forth in paragraphs 1 through 15, inclusive, set forth in this Statement of Claims, as though fully set forth herein.

17.   On 10 January 2003, INNOVATIVE and NICKEL entered into a written License Agreement (the "Agreement"), a copy of which is marked Exhibit A, attached hereto and by this reference is incorporated herein.

18.   In consideration for its grant of the licensing rights under the Agreement, NICKEL agreed to pay  to INNOVATIVE a licensing fee in the amount of

"THREE HUNDRED THOUSAND Dollars ($300,000.00 USD), payable over a period of eighteen (18) months, in twelve (12) equal monthly installments in the amount of $25,000.00 USD, commencing on the seventh (7th) month from the anniversary date of the execution of the Agreement and continuing on a successive monthly basis through the eighteenth (18th) month from the anniversary date of the execution of this Agreement."

*p. 3, Exh. A, Lic. Agmt.*

19.   In addition to the payment of the licensing fee, NICKEL agreed to take the following actions:

(a)   "launch and market, on a commercially acceptable basis, at least one product in each Minor Field of Use within six months of the execution of this Agreement; *p. 3, Exh. A, Lic. Agmt.*

(b)   "launch and market, on a commercially acceptable basis, at least a minimum line of products addressing the specific needs of each Minor Field of Use within one year"; *p. 3, Exh. A, Lic. Agmt.*

(c)   "on a best efforts basis" to "use expedited reasonable efforts to design, produce, manufacture, market and sell the Licensed Products into the commercial market as soon as practicable." *p. 3, Exh. A, Lic. Agmt.*

(d)   ". . . spend 5% of the gross revenues of the Licensed products on the marketing and advertisement of all Licensed Products within the Licensed Territory." *p. 3, Exh. A, Lic. Agmt.*

(e)   ". . . report monthly on required expenditures for advertising and marketing" and examples of said advertising and marketing product"; *p. 3, Exh. A, Lic. Agmt.*

(f)   " . . . provide written reports . . . quarterly within thirty (30) calendar days after the close of each fiscal quarter", stating with accuracy and in detail "the customer and number of Licensed Products sold and distributed during the preceding three (3) calendar months" with "certification from its Chief Financial Officer. . . " *p. 4, Exh. A, Lic. Agmt.* and

(g)   "honestly, faithfully and strictly comply with all applicable federal, state and local laws", including securities laws. *p. 3, Exh. A, Lic. Agmt.*

20.   Furthermore, the Licensing Agreement expressly provides that it or any part thereof "may not be transferred or assigned by (NICKEL) without the written consent of INNOVATIVE." *p. 9, Exh. A, Lic. Agmt.* Recently, on or about 25 September 2003, INNOVATIVE was informed and advised by Ms. Helle A. Madso, FALKEN's Executive Vice President, that, in direct contravention to the express terms of the Agreement and without the written consent of INNOVATIVE, NICKEL's rights, title and interest under the Licensing Agreement had been transferred and assigned to FALKEN and that FALKEN was the "assignee of Nickel, Ltd." as to all of NICKEL's rights under the License Agreement. This provision was expressly bargained and negotiated by INNOVATIVE based upon NICKEL and its executives' representations as to NICKEL's alleged market presence as a "dynamic consumer and industrial goods manufacturer with a leading role in the market for innovative wet-wipe technology and time-tested marketing know-how for cleaning and hygiene products and accessories."

21.   Respondents NICKEL and FALKEN, and each of them, have breached the express terms of the Agreement by committing or engaging in the following acts and/or conduct:

(a)   Failing to commence and make payment of the licensing fee in the amount of $300,000.00;

05/07 '04 10:52  TEL 00_____422316     NICKEL FINANCE ____     ☑06

(b)   Failing to "launch and market, on a commercially acceptable basis, at least one product in each Minor Field of Use within six months of the execution of this Agreement; *p. 3, Exh. A, Lic. Agmt.*

(c)   Failing to "launch and market, on a commercially acceptable basis, at least a minimum line of products addressing the specific needs of each Minor Field of Use within one year"; *p. 3, Exh. A, Lic. Agmt.*

(d)·  Failing to utilize "on a best efforts basis" all "expedited reasonable efforts to design, produce, manufacture, market and sell the Licensed Products into the commercial market as soon as practicable." *p. 3, Exh. A, Lic. Agmt.*

(e)   Failing to "spend 5% of the gross revenues of the Licensed products on the marketing and advertisement of all Licensed Products within the Licensed Territory." *p. 3, Exh. A, Lic. Agmt.*

(f)   Failing to "report monthly on required expenditures for advertising and marketing" and examples of said advertising and marketing product"; *p. 3, Exh. A, Lic. Agmt.*

(g)   Failing to "provide written reports . . . quarterly within thirty (30) calendar days after the close of each fiscal quarter", stating with accuracy and in detail "the customer and number of Licensed Products sold and distributed during the preceding three (3) calendar months" with "certification from its Chief Financial Officer. . . " *p. 4, Exh. A, Lic. Agmt.;*

(h)   Failing to "honestly, faithfully and strictly comply with all applicable ʹederal, state and local laws", including securities laws. *p. 3, Exh. A, Lic. Agmt.;* and

(i)   Assigning its rights under the Agreement to FALKEN "without the written consent of INNOVATIVE." *p. 9, Exh. A, Lic. Agmt.*

22.   Claimant PURE-BIO has performed all conditions, covenants and promises required to perform on its part pursuant to the terms of the Licensing Agreement.

23.   By reason of the above-described breach of contract, Claimant PURE-BIO has been damaged and suffered losses in excess of Three Hundred Thousand Dollars ($300,000.00), exclusive of interest, the exact amount of which shall be the subject of proof at trial.

24.   The Licensing Agreement expressly provides that:

> **In the event that it becomes necessary to initiate legal proceedings by either party to enforce any of the terms or provisions of this Agreement, to recover damages, or to obtain any relief, at law or in equity, the prevailing party shall be entitled to recover, in addition to any relief afforded or obtained in such proceeding, reasonable attorneys' fees and costs as well as any court costs incurred by such party in connection.**

25.     As a direct result of respondents NICKEL and FALKEN's breaches, claimant PURE-BIO has been compelled to engage the law firm of WOLFGANG F. HAHN & ASSOCIATES to prosecute the instant action. Pursuant to the terms of the Licensing Agreement, claimant PURE-BIO is entitled to its reasonable attorney's fees, costs and expense in connection herewith.

### CLAIM    NO. 2:          BREACH OF CONTRACT: FAILURE TO PAY FOR SHIPPED AND DELIVERED AXEN® PRODUCT

26.     Claimant PURE-BIO realleges and incorporates herein by reference each and all of the Factual Allegations hereinabove set forth in paragraphs 1 through 15, inclusive, set forth in this Statement of Claims, as though fully set forth herein.

27.     On or about 8 January 2003, pursuant to the terms of the Licensing Agreement, respondent NICKEL submitted its order for the shipment and delivery of thirty-two (32) 55-gallon drums (approximately 1,760 gallons) of Axen® 30 to claimant PURE-BIO. [Purchase Order No. CDF 03/0918].

28.     Pursuant to the terms of the Licensing Agreement, respondent NICKEL agreed to pay to claimant PURE-BIO the sum of $27,520.00, plus freight and shipping costs, for its shipment and delivery of thirty-two (32) 55-gallon drums of Axen® 30 ordered by respondent NICKEL.

29.     On 20 January 2003, claimant PURE-BIO caused the thirty-two (32) 55-gallon drums of Axen® 30 to be shipped from San Diego, California for delivery to respondent NICKEL, arriving at Le Havre, France on 28 February 2003, receipt of which was subsequently acknowledged by respondent NICKEL on 24 March 2003 by NICKEL's representative Neil Spivey.

30.     Pursuant to the terms of the Licensing Agreement and claimant PURE-BIO's standard purchase terms and conditions, payment in the amount of $27,520.00 for the thirty-two (32) 55-gallon drums of Axen® 30 shipped and delivered to respondent NICKEL, was due and payable on 28 February 2003.

31.     Commencing on 19 February 2003 and continuing to the present, respondent NICKEL breached the terms of the Licensing Agreement and claimant PURE-BIO's standard

purchase terms and conditions by failing to pay the entire outstanding invoice amount due, together with plus shipping and freight charges in the amount of $2,745.01.

32.     By reason of the above-described conduct, claimant PURE-BIO has been damaged in the principal sum of $27,520.00, plus shipping and freight charges in the amount of $2,745.01, together with interest on the unpaid amount in the approximate amount of $2,774.29 through 31 January 2004 and continuing thereafter at the rate of $8.40 per day and according to proof at the arbitration hearing.

33.     As a direct result of respondents NICKEL and FALKEN's breaches, claimant PURE-BIO has been compelled to engage the law firm of WOLFGANG F. HAHN & ASSOCIATES to prosecute the instant action. Pursuant to the terms of the Licensing Agreement, claimant PURE-BIO is entitled to its reasonable attorney's fees, costs and expense in connection herewith.

### CLAIM   NO. 3:          INJUNCTIVE RELIEF

34.     Claimant PURE-BIO realleges and incorporates herein by reference each and all of the Factual Allegations hereinabove set forth in paragraphs 1 through 15, inclusive, set forth in this Statement of Claims, as though fully set forth herein.

35     With deliberate timing to coincide with its acquisition of all of NVID's rights, title and interest under the Core Settlement Agreement and its assignment from NICKEL of all rights, title and interest in the Umbrella Agreement and the Licensing Agreement, FALKEN[2] initiated a continuous barrage of publicly disseminated postings of intentionally false, misleading and disparaging statements intended to cause damage to PURE-BIO's licensing and marketing efforts of its Axenohl® patent rights. Some examples of these libelous postings are:

> (a)     INNOVATIVE is "hovering on the threshold of bankruptcy";
>
> (b)     "FALKEN INDUSTRIES LTD. . . also acquired from NVID International Ltd NVID:OTC all of its interest in the Axenohl® patent,

---

[2]      Without doubt, these postings were initiated by Emile Gouiran under either *nom de plume*: nickelinfo (Yahoo!Finance) or nickel-dispatches (Lycos/Raging Bull). This linkage can be readily established by reviewing the 6 October 2003 posting addressed to Miller and McCollum, PURE-BIO's auditors, who, as part of their annual audit contacted NICKEL to confirm an outstanding account balance due PURE-BIO in the amount of approximately $30,000.00 and comparing it to NICKEL's formal response dated 6 October 2003 from Harry S. Swanson, NICKEL's General Counsel, a copy of which is also attached as part of Exhibit D.

concentrate for the Axen product solution"; *[12 Oct. 2003 (Yahoo!Finance # 4181];*

(c) "FALKEN . . . acquired contractual rights and exclusivities, non-competition agreements and other similar privileges as against IMS who is consequently barred from marketing Axen in Europe as a whole and in the United States, except as a component of Clean Plus®' Bac'Out® line of disinfectants";

(d) "Now while the patent was assigned to IMS in the "Core Settlement Agreement", NVID reserved to itself substantial rights, including that of recovering the patent. IMS is in serious violation of a number of provisions in that contract" *[24 Oct. 2003 (Lycos/Raging Bull # 9365)];*

(e) ". . . IMS has forfeited its rights to the patent, that patent subsequently reverts back to FALKEN under the Core Agreement. Hence as of this day[3], FALKEN INDUSTRIES, LTD. is the owner of the Axenohl® Patent and all derivatives (judicial determination is being prepared);" *[24 Sep. 2003 (Raging Bull Message Board Posting # 9365); 25 Sep. 2003 (Raging Bull Message Board Posting # 9374)];*

(f) "FALKEN owns the Axenohl® Patent and all Axen derivatives. . ." *[25 Sep. 2003 (Raging Bull Message Board Posting # 9374)];*

(g) "FALKEN has the unqualified absolute right to Axen sales anywhere in Europe (and in other countries) and in the United States This under contracts with IMS (PURE)"; *[25 Sep. 2003 (Raging Bull Message Board Postings # 9374 & # 9392)];*

(h) "IMS has contractually barred itself from all rights, or possibilities of ever selling Axenohl/Axen technology or products in the United States or in Europe, the two largest markets in the world . . ."; *[21 Sep. 2003 (Raging Bull Message Board Posting # 9315)];*

(i) "Falken will soon commence manufacture of Axenohl and consequently Axen derivatives. Any party with technical knowledge, or in any fashion able to assist in manufacture or plant management is invited to apply for collaboration – send CV or contact information to info@nickelltd.com; *[24 Sep. 2003 (Raging Bull Message Board Posting # 9365); 25 Sep. 2003 (Raging Bull Message Board Posting # 9374 & Posting # 9392)];*

(j) "FALKEN will commence production of Axenohl® at its ROUEN (FRANCE) facility as early as January 2004 and intends to outsource productions locally for its US based sales. Test productions have been successfully analysed by certifying laboratories"; *(12 Oct. 2003.(Raging Bull Message Board Posting # 9632);* and

---

[3] Statement was posted on "Raging Bull" PURE Message Board on 25 September 2003 @ 1.00 P.M. EDT.

36.    Claimant PURE-BIO is informed and believes and thereon alleges that unless immediately enjoined, respondents NICKEL and FALKEN fully intend to continue to commit the acts outlined in paragraph 35 hereinabove, and thereby will continue to directly interfere with, and wrongfully mislead the public as the true ownership of its Axenohl® patent rights – a legitimate property right of Claimant PURE-BIO - pending the final determination in this action in direct violation of Claimant PURE-BIO's legal rights. Accordingly, assets and property of Claimant PURE-BIO are in danger of being materially injured.

37.    Based upon the facts alleged hereinabove, Claimant PURE-BIO is entitled to an order from this arbitrator, enjoining and restraining respondents NICKEL and FALKEN, their agents and employees from the further commission of any of the acts outlined in paragraph 35 above.

38.    Claimant PURE-BIO has no adequate remedy at law for the pattern of conduct currently being engaged in and threatened by respondents NICKEL and FALKEN, and if the respondents NICKEL and FALKEN are permitted to continue this pattern of conduct and behavior unabated, Claimant PURE-BIO will suffer irreparable damage.

### CLAIM    NO. 4:    DECLARATORY RELIEF RE LICENSING AGREEMENT

39.    Claimant PURE-BIO realleges and incorporates herein by reference each and all of the Factual Allegations hereinabove set forth in paragraphs 1 through 15, inclusive, set forth in this Statement of Claims, as though fully set forth herein.

40.    An actual controversy has arisen and now exists in that respondents NICKEL and its assignee, FALKEN, contend that they remain entitled to use, sell, market and manufacture the Licensed Technology and Licensed Products i.e. containing Axenohl® patent, Axen® and its related technology on a non-exclusive basis in a specifically defined Licensed Territory. Claimant PURE-BIO contends that the Licensing Agreement has expired and any extensions provided for in the Licensing Agreement were expressly conditioned upon NICKEL meeting or exceeding "minimum threshold AXEN purchases" of "$600,000.00 USD purchase and fully paid for in the first

twelve months", which has not occurred. Respondents NICKEL and its assignee, FALKEN, have refused to admit that they have no further rights under the Licensing Agreement and that the Licensing Agreement has terminated by its express operative terms and by respondents NICKEL and FALKEN's failure to meet the "minimum threshold AXEN purchases" as well as their failure to adhere perform the obligations and duties incumbent upon them, as more fully set forth in paragraph hereof. Moreover, NICKEL, FALKEN and its executives and representatives have openly made representations to third parties that FALKEN "owns the Axenohl® Patent and all Axen derivatives. . ." and "will soon commence manufacture of Axenohl® and consequently Axen® derivatives" .

41.     A judicial determination of the respective rights and obligations of the parties under the Licensing Agreement with respect to the parties' respective rights is necessary and appropriate to resolve the foregoing controversy.

## REMEDIES SOUGHT AS AND AGAINST NICKEL AND FALKEN

### A.     DETERMINATIONS BY ARBITRATOR.

1.     NICKEL BREACHED THE LICENSING AGREEMENT BY FAILING TO PAY THE LICENSING FEE IN THE AMOUNT OF $300,000.00. CLAIMANT PURE-BIO IS ENTITLED TO PAYMENT OF THE LICENSING FEE, TOGETHER WITH INTEREST AT THE LEGAL RATE FROM THE DATES PAYMENT(S) WERE DUE.

2.     NICKEL BREACHED THE LICENSING AGREEMENT BY FAILING TO USE "EXPEDITED REASONABLE EFFORTS TO DESIGN, PRODUCE, MANUFACTURE, MARKET AND SELL THE LICENSED PRODUCTS. DAMAGES ACCORDING TO PROOF AT ARBITRATION HEARING.

3.     NICKEL BREACHED THE LICENSING AGREEMENT BY FAILING TO "SPEND 5% OF THE GROSS REVENUES OF THE LICENSED PRODUCTS ON THE MARKETING AND ADVERTISEMENT OF ALL LICENSED PRODUCTS WITHIN THE LICENSED TERRITORY." DAMAGES ACCORDING TO PROOF AT ARBITRATION HEARING.

4.     NICKEL BREACHED THE LICENSING AGREEMENT BY FAILING TO "REPORT MONTHLY ON REQUIRED EXPENDITURES FOR ADVERTISING AND MARKETING" AND EXAMPLES OF SAID ADVERTISING AND MARKETING PRODUCT". DAMAGES ACCORDING TO PROOF AT ARBITRATION HEARING.

5.   NICKEL BREACHED THE LICENSING AGREEMENT BY FAILING TO "PROVIDE WRITTEN REPORTS . . . QUARTERLY WITHIN THIRTY (30) CALENDAR DAYS AFTER THE CLOSE OF EACH FISCAL QUARTER", STATING WITH ACCURACY AND IN DETAIL "THE CUSTOMER AND NUMBER OF LICENSED PRODUCTS SOLD AND DISTRIBUTED DURING THE PRECEDING THREE (3) CALENDAR MONTHS" WITH "CERTIFICATION FROM ITS CHIEF FINANCIAL OFFICER. . . " DAMAGES ACCORDING TO PROOF AT ARBITRATION HEARING.

6.   FALKEN AND NICKEL ARE IN MATERIAL BREACH OF THE LICESNING AGREEMENT AND ARE JOINTLY AND SEVERALLY LIABLE FOR DAMAGES ASSESSED BY THE ARBITRATOR IN THIS PROCEEDING;

7.   AN ARBITRAL DETERMINATION OF THE PARTIES' RESPECTIVE RIGHTS AND OBLIGATIONS UNDER THE LICENSING AGREEMENT, AND ANY RELATED DOCUMENTS, INCLUDING A DETERMINATION THAT THE LICENSING AGREEMENT HAS BEEN TERMINATED BY ITS OPERATIVE PROVISIONS AND THAT RESPONDENTS NICKEL AND FALKEN HAVE BREACHED ITS EXPRESS TERMS BY THEIR COMBINED FAILURES TO PERFORM THE OBLIGATIONS AND DUTIES INCUMBENT UPON THEM PURSUANT TO ITS TERMS; AND

8.   ISSUANCE OF A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND/OR PERMANENT INJUNCTION ENJOINING AND RESTRAINING FALKEN, NICKEL AND THEIR AGENTS FROM ANY OF THE ACTS AND/OR PATTERN OF CONDUCT OUTLINED IN PARAGRAPH 35 OF THIS STATEMENT OF CLAIMS;

B.   **AWARD OF DAMAGES.**

9.   COMPENSATORY DAMAGES IN THE AMOUNT OF $300,000.00, TOGETHER WITH INTEREST THEREON, AS PERMITTED BY LAW;

10.   COMPENSATORY DAMAGES IN THE AMOUNT OF $30,265.01, TOGETHER WITH INTEREST THEREON, AS PERMITTED BY LAW;

11.   COMPENSATORY DAMAGES IN AN AMOUNT SUBJECT TO PROOF AT ARBITRATION HEARING

[THIS SECTION LEFT INTENTIONALLY BLANK]

**REMEDIES SOUGHT AS AND AGAINST ALL PARTIES ON ALL CLAIMS**

12.     PREJUDGMENT INTEREST ON ALL DAMAGES AS PERMITTED BY LAW;

12.     REASONABLE ATTORNEYS' FEES AND COSTS OF ARBITRATION, AS PERMITTED BY THE TERMS OF THE LICENSING AGREEMENT;

13.     COSTS OF SUIT HEREIN; AND

14.     SUCH OTHER AND FURTHER RELIEF AS THE ARBITRATOR DEEMS JUST AND PROPER.

Respectfully submitted,

WOLFGANG F. HAHN & ASSOCIATES

DATED: 4 May 2004         By: _____
                                  WOLFGANG F. HAHN
                                  Attorney for Claimant
                                  PURE BIOSCIENCE



INNOVATIVE
MEDICAL
SERVICES
a NASDAQ company

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

This License Agreement [the "Agreement"], is made, entered into and effective as of January 10th 2003 ["Agreement Date"], by and between Innovative Medical Services ("INNOVATIVE"), a California corporation, having its principal place of business at 1725 Gillespie Way, El Cajon, CA 92020, and Nickel, Ltd., a New Jersey corporation, with its principal place of business at 146 rue du Chateau, 75014 Paris, France ["LICENSEE"].

### RECITALS

INNOVATIVE is the owner and/or assignee of patents and certain technology [collectively the "Licensed Technology"], as defined below;

LICENSEE desires to obtain certain limited exclusive and limited non-exclusive licenses to use, sell, and market the Licensed Technology and the Licensed Products in a specified territory;

INNOVATIVE is willing to grant non-transferable limited licenses for the Licensed Technology and the respective Licensed Products to LICENSEE on the terms set forth herein; and

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto expressly agree as follows:

### DEFINITIONS

The term "Licensed Technology" shall mean silver di-hydrogen citrate (hereinafter "Axen"), a silver ion product with marketable disinfectant properties, the subject of United States Patent No. 6,197,814; WIPO App. No. WO 99/18790; together with all trade secrets as defined in California Civil Code section 3426.1 and the case law interpreting such section, unpatented inventions, all patents pending, filed or granted in the United States and in all other countries, know-how and other rights, related to said patents.

The term "patent rights" as used herein, shall, in addition to U.S. Patent No. 6,197,814, include all, renewals, reissues and foreign counterparts thereof.

The term "Licensed Product(s)," shall mean "Axen," at a 30 ppm diluted strength of the patented concentrate.

The term "Wet Wipes" shall mean an application product substantially similar to LICENSEE's current line of Clean Plus® wipe products as of the date of this Agreement.

The term "Liquid and Spray" shall mean an application product substantially similar to INNOVATIVE's current CleanKill 30™ liquid or spray product at 30 ppm concentration.

The term "know-how" shall mean all factual knowledge and proprietary information pertaining to the Licensed Technology and used or useful in the development, production or manufacture of the Licensed Products utilizing the Licensed Technology normally held in the industry as trade secrets or otherwise as confidential information, including without limitation, all pharmacological, clinical, chemical, biochemical, toxicological, manufacturing, business, financial, formulation and scientific research data or information, whether or not capable of precise description.

The term "Licensed Territory" shall be as defined as granted in Exhibit A.

The term "Major Field of Use" shall mean a general field of business. Within this category are "Minor Fields of Use" that reflect related sub-categories of businesses with similar purchasing needs.

The term "Improvements" shall mean and include any and all patentable or non-patentable additions, alterations, modifications, design changes, and other improvements to the Licensed Products which are individually developed by INNOVATIVE, or jointly developed by INNOVATIVE, LICENSEE, and/or any third party at any time during the term of this Agreement.

The term "Confidential Data and/or Information" shall mean all transferable technical information, including but not limited to, data, reports, programs, methods, tapes, recorded notes, computer-generated data, Cad-Cam drawings, regulatory submittals, tests, studies, and other written documents or computer programs, and any and all information embodied in a tangible form relating to the Licensed Technology or

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

Licensed Products licensed pursuant to this Agreement and disclosed to the non-transferring party in tangible form. Such technical information, data, and other items referenced in the preceding sentence shall be deemed to be "confidential" within the meaning hereof when, and so long as, it relates to the Licensed Technology or Licensed Products and applications thereof, is not in the possession of the transferring party without binder of secrecy prior to the disclosure thereof except in the event same is wrongfully obtained by, or wrongfully disclosed to, the transferring party; or is not then and does not become part of the public knowledge and literature through the fault of the transferring party; or is not thereafter received from a third party other than an affiliate without binder of secrecy.

The term "affiliate, affiliates or subsidiaries" shall mean any corporation, partnership, joint venture or other entity of which the common stock or other equity ownership thereof is ten percent (10%) or more owned by LICENSEE.

The term "best efforts" shall mean that the obligated party is required to make continuing diligent and good faith efforts to accomplish the applicable objective.

The term "parties" shall mean INNOVATIVE and LICENSEE.

### GRANT OF LICENSE

INNOVATIVE hereby grants to LICENSEE two unique and separate Licenses as to the Licensed Territory only:

(1) A limited exclusive, non-transferable, right and license to the Licensed Technology for Wet Wipe as Hard Surface Disinfectant/Cleansing products only. This license allows Wet Wipe manufacture, distribution, marketing and selling of Wet Wipe products utilizing the Licensed Product(s).

(2) A limited non-exclusive, non-transferable, right and license to the Licensed Technology for a Liquid and Spray as Hard Surface Disinfectant/Cleansing products only. This license allows "Liquid and Spray" manufacture, distribution, marketing and selling of "Liquid and Spray" products utilizing the "Licensed Product(s)."

(3) The above licenses are authorized for the following Major and Minor Fields of Use categories:
   i. Healthcare
      1. Hospitals
      2. Doctor's offices
      3. Clinics
      4. Institutions
   ii. Educational/Childcare facilities
      1. Institutions
      2. Penal
      3. Mental
   iii. Hospitality
      1. Hotels
      2. Restaurants
      3. Transportation
   iv. Food Processing
   v. Military

In order for LICENSEE to retain exclusive and/or non-exclusive licenses in the Major and Minor Fields of Use categories delineated above, LICENSEE must launch and market, on a commercially acceptable basis, at least one product in each Minor Field of Use within six months of the execution of this Agreement. LICENSEE will launch and market, on a commercially acceptable basis, at least a minimum line of products addressing the specific needs of each Minor Field of Use within one year.

INNOVATIVE shall, at all times, retain the right to:
(i) Use the Licensed Technology and Products for its business needs;
(ii) Use the Licensed Technology and Products for additional research purposes; and
(iii) Grant non-exclusive licenses and other rights to the Licensed Technology and Products to third parties, whether such be commercial entities, academic institutions or other persons.

### Testing Requirements for Newly Developed Products
LICENSEE is required to ensure that INNOVATIVE shares in the results of the testing for new products. Specifically, INNOVATIVE will be included as a beneficiary on all reports from testing laboratories destined for product support or regulatory approval.

### Price and Payment
Products will be sold by INNOVATIVE to LICENSEE at the prices established by INNOVATIVE from time-to-time. INNOVATIVE is entitled to change its prices at any time by giving 30-days written notice to LICENSEE specifying newly established purchase terms and/or conditions. Unless otherwise agreed to in writing, LICENSEE will arrange, in advance of shipment of Licensed Product, for payment by letter of credit.



# Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

If a credit account is established with INNOVATIVE for LICENSEE, LICENSEE will pay invoices within 30 days ex factory inclusive of shipping, handling, fees, taxes and tariffs. LICENSEE will pay interest on any overdue invoice amount at the rate of 1-1/2 percent per month (or the highest rate allowed by *law, whichever is less*), *said interest to be* compounded monthly.

## MARKETING OF LICENSED PRODUCTS AND TRAINING

**Due Diligence By LICENSEE.**
On a "best efforts" basis, LICENSEE shall use expedited reasonable efforts to design, produce, manufacture, market and sell the Licensed Products into the commercial market as soon as practicable.

**Training and Assistance.**
INNOVATIVE shall upon written request and at the expense of LICENSEE, furnish and provide to *LICENSEE and its employees*, all reasonable technical assistance, literature, manuals, materials, catalogues, descriptive literature, information and data pertinent to the Licensed Technology and reasonably necessary for the exploitation of the License by LICENSEE, but in no event shall this obligation be construed to include any obligation to divulge the formula and/or manufacturing secret(s) of Axenohl.

**Notice of Improvements.**
During the term of this Agreement, LICENSEE shall give written notice ["Improvement Notice"] to INNOVATIVE within thirty (30) days of any actual or constructive reduction to practice of any *Improvement made* to any of the Licensed Technology or Licensed Products and/or know-how by LICENSEE's employees, agents and officers. Said LICENSEE Improvements shall be owned solely by INNOVATIVE, which shall have the right to seek, obtain, enforce and defend any and all intellectual property protection therefore in its own *name*, and in its sole discretion.

**New Patents.**
A new patent, patent pending, trademark or other intellectual property protection derived or derivable from any improvement over inventions covered by the Licensed Technology shall be deemed owned exclusively by INNOVATIVE.

**Compliance With Laws**
LICENSEE will honestly, faithfully, and strictly comply with all applicable federal, state and local laws. LICENSEE expressly indemnifies and agrees to defend INNOVATIVE and/or its shareholders, officers and agents regarding any civil, administrative, or criminal claims made as a result of LICENSEE's alleged violation of this paragraph.

## *LICENSING FEE AND ROYALTY PAYMENTS.*

**Licensing Fee.**
As consideration for the rights conveyed by INNOVATIVE to LICENSEE under this Agreement, LICENSEE shall pay to INNOVATIVE a licensing fee in the amount of $300,000.00 USD (waived), payable upon execution of this Agreement.

THREE HUNDRED THOUSAND Dollars ($300,000.00 USD), payable over a period of eighteen (18) months, in twelve (12) equal monthly installments in the amount of $25,000 USD, commencing on the seventh (7th) month from the anniversary date of the execution of the this Agreement and continuing on a successive monthly basis *through the eighteenth (18th) month from the* anniversary date of the execution of the this Agreement.

**Running Royalty Payment.**
In addition to the foregoing licensing fee, for the rights, privileges and license granted hereunder, LICENSEE shall pay to INNOVATIVE a royalty payment equal to (waived) percent (___%) of the actual Gross Sales in the first year, and thereafter equal to (waived) percent (___%) of the actual Gross Sales.

**Reimbursement for Research and Development.**
LICENSEE shall pay to INNOVATIVE a research and development fee in the amount of (waived) payable upon certain milestones as defined in Exhibit A (waived).

*Marketing / Advertising Requirement.*
To ensure the products developed and produced utilizing Axen as an active ingredient have proper exposure, LICENSEE must spend 5% of the gross revenues of the Licensed Products on the marketing and advertisement of all Licensed Products within the licensed Territory.
Licensee will report monthly on required expenditures for advertising and marketing, to include examples of said advertising and marketing product.

**Payments of Licensing Fees And Royalty Payments.**
All licensing fee payments and royalty payments due hereunder are expressed in and shall be paid by check

CONFIDENTIAL LICENSING AGREEMENT
BY AND BETWEEN INNOVATIVE MEDICAL SERVICES
AND NICKEL LTD.
PAGE 3

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

payable in United States of America currency, without deduction of exchange, collection or other charges, to INNOVATIVE, or to INNOVATIVE's account at such bank as the INNOVATIVE may from time to time designate by notice to LICENSEE within ten (10) days from the due date. In the event that any payment due hereunder *is not made when due*, the payment shall accrue interest beginning on the tenth day following the due date thereof, calculated at the annual rate of the sum of (a) two percent (2%) plus (b) the prime interest rate quoted by The Wall Street Journal on the date said payment is due, the interest being compounded on the last day of each calendar month, provided, however, that in no event shall said annual interest rate exceed the maximum legal interest rate for corporations. Said interest and the payment and acceptance thereof shall not negate or waive the right of the INNOVATIVE to seek any other remedy, legal or equitable, to which it may be entitled because of the delinquency of any payment.

### Responsibility for Fees
LICENSEE is responsible for payment of all tariffs, fees and taxes related to the development, marketing, and/or sales of LICENSEE's products.

### Security Interest
In the event INNOVATIVE provides financing or guarantees the financing of any Licensed Products sold to LICENSEE, LICENSEE grants INNOVATIVE a security interest in all Licensed Products and in all proceeds from LICENSEE's sale of Licensed Products as security for payment of all indebtedness owed to or guaranteed by INNOVATIVE. *LICENSEE agrees to execute and deliver any documents* INNOVATIVE requests in order to legally perfect INNOVATIVE's security interest, including formal security agreement(s) and/or UCC-1 financing statements.

### RECORDS, REPORTS, AUDIT AND INSPECTION RIGHTS

### Maintenance of Records.
LICENSEE shall maintain or cause to be maintained, *for a minimum of two (2) years*, proper records and books of account relating to its activities under this Agreement.

### Timing and Content Of Reports.
LICENSEE will provide written reports to INNOVATIVE quarterly within thirty (30) calendar days after the close of each fiscal quarter. Each report shall state the customer and number of Licensed Products sold and distributed during the

preceding three (3) calendar months. With each report, LICENSEE will provide the certification from its Chief Financial Officer that the calculations are correct and have been executed in compliance with this License Agreement.

### Payments.
Concurrently with the making of each report required by LICENSEE, LICENSEE will pay to INNOVATIVE the royalty payments at the rate specified.

### Royalty Accounting Records.
LICENSEE will keep records showing the Licensed Products distributed and sold and such records to be in sufficient detail to enable the royalties payable to INNOVATIVE to be determined. LICENSEE will also permit its books and records to be examined *from time to time as provided above to the extent necessary* to verify the reports provided, such examination to be made at the expense of INNOVATIVE by an independent auditor appointed by INNOVATIVE, who shall report to INNOVATIVE thereupon. In the event that the royalties due are determined by the independent auditor to be more than 5% greater than the actual royalties paid any fiscal quarter, LICENSEE shall remit the difference and promptly reimburse INNOVATIVE for the costs of the audit. Upon termination of this Agreement for any reason, INNOVATIVE shall have the right to have a final audit conducted by an independent auditor appointed by INNOVATIVE.

### Audit Procedures.
INNOVATIVE will have the right at any reasonable *time or times*, to cause a third party independent auditor not engaged on a contingency basis and approved by LICENSEE (not to be unreasonably withheld) to inspect and audit the books and records of LICENSEE in order to verify the contents of the reports required by this Agreement. Any such audit (i) shall be conducted after reasonable prior notice, during normal business hours and at the location(s) where such books and records are normally kept and (ii) may not be conducted more than once in any given six (6) month period. Notwithstanding the foregoing, in the event that any such audit results in a correcting payment, INNOVATIVE shall have the right to conduct up to two (2) such audits in the subsequent period. Such audit and the results thereof shall be confidential, except for use, subject to reasonable protective orders to which the parties shall stipulate, in connection with proceedings to compel a correcting payment as set forth. The auditor shall provide a copy of such report to LICENSEE




## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

concurrently with reporting to INNOVATIVE.

### PATENTS, TRADEMARKS, COPYRIGHTS AND INFRINGEMENT

#### Patents, Trademarks & Copyrights

INNOVATIVE makes no representation or warranty as to whether Licensed Product or any other product infringes or will infringe upon any patent or other proprietary right which any person or organization holds or may hold in the future.

LICENSEE acknowledges the validity of all trademarks, copyrights or other related proprietary rights which INNOVATIVE holds or may hold in the future with respect to the Licensed Product. LICENSEE shall not adopt any of said INNOVATIVE trademarks, or any trademark confusingly similar thereto, or use such trademarks without the prior written approval of INNOVATIVE.

#### Ownership of Trade Names and Marks

The INNOVATIVE name and the associated trademarks (and the copyrights of all materials created by INNOVATIVE or used in connection with the Licensed Products) are and will remain the property of INNOVATIVE. LICENSEE will use trade names, marks and logos only as directed or approved in writing by authorized INNOVATIVE personnel, and will promptly institute any changes requested by INNOVATIVE. LICENSEE will not, during or after the term of this Agreement, adopt any trade name, trademark, service mark or logo, which is similar to or likely to be confused with any names or marks used by INNOVATIVE. LICENSEE will immediately notify INNOVATIVE of any claims or complaints made by third Parties related to names or trademarks of INNOVATIVE and will permit (but not obligate) INNOVATIVE to assume the defense of any action against LICENSEE in connection with such names or trademarks.

#### Warranty of Title by INNOVATIVE.

INNOVATIVE warrants that it has good and marketable title, and all rights necessary to grant the licenses and rights herein granted, to the patents licensed hereunder.

#### Patent Maintenance by INNOVATIVE.

INNOVATIVE shall maintain each of its patents licensed hereunder in all jurisdictions in the Territory in which they or equivalents have been filed, for the term of the Agreement. To the degree necessary, LICENSEE agrees to cooperate in connection with INNOVATIVE's maintenance of its patents licensed hereunder and to take any and all actions necessary to transfer the necessary documents and rights required

for, and to do such other things as are from time to time necessary to comply with the requirements of, this Section.

#### Notice of Infringement And Initiation Of Action.

LICENSEE shall promptly inform INNOVATIVE of any suspected infringement of any claims in the patent rights or misuse, misappropriation, theft or breach of confidence of other proprietary rights in the Licensed Technology by a third party.

#### Effect of Invalidation.

In the event that any of the patents licensed hereunder are invalidated by a final judgment of a court of proper jurisdiction royalties will cease for that jurisdiction, but no refunds of royalties paid under this Agreement prior to the date of invalidation will be due.

### REPRESENTATIONS AND WARRANTIES

#### Mutual Representations.

Each party represents and warrants that (i) it is a corporation in good standing under the laws of the state of its incorporation; that (ii) it has the authority to enter into this Agreement; that (iii) it has obtained all corporate approvals necessary to enter into this Agreement; that (iv) this Agreement is valid and binding and enforceable in accordance with its terms; and that (v) its execution, delivery, and performance of this Agreement will not infringe upon the rights of any third party or violate the provisions of any agreement to which it is a party.

#### Reliance on Warranties, Disclaimers and Limitations.

The Licensing Fee and Royalty Payments for the Licensed Technology and Licensed Products and the substance of the other rights and duties of LICENSEE and INNOVATIVE in this Agreement, have been negotiated in reliance on, and are based upon the applicability and enforceability of the warranties, limitations and disclaimers contained herein.

#### Limited Warranties as to Licensed Products.

Other than as specifically set forth, INNOVATIVE makes no warranties or representations, expressed or implied, including, but not limited to, warranties of fitness or merchantability, regarding or with respect to the Licensed Products.

#### Disclaimers by INNOVATIVE.

Other than the product warranties and specifications specifically set forth above, neither INNOVATIVE, nor any of its officers, employees, directors,

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

researchers, trustees, or agents assume any responsibility for the manufacture, product specifications, sale or use of the Licensed Technology or the Licensed Products, which are sold by LICENSEE.

### TERM AND TERMINATION

This Agreement shall take effect as specified, and shall continue in effect for the term of One Year. Thereafter, and at the option of the LICENSEE upon sixty days written notice, this Agreement shall be extended in one year increments to a maximum of Five years. This LICENSEE option to extend is expressly conditioned upon the LICENSEE having remained in timely and strict compliance with the expressed and implied terms of this Agreement, and upon the LICENSEE meeting the following minimum threshold AXEN purchases: (i) $600,000.00 USD purchased and fully paid for in the first 12 months (ii) $1,600,000.00 USD purchased and fully paid for by the end of year 2 (iii) a total of $3,000,000.00 USD purchased and fully paid for by the end of year 3 (iv) a total of $4,200,000.00 USD purchased and fully paid for by the end of year 4.

In the event of default or failure by LICENSEE to perform any of the terms, covenants or provisions of this Agreement, LICENSEE shall have thirty (30) days from notice to correct said default. If such default is not corrected within the said thirty (30) day cure period, INNOVATIVE shall have the right, at its option, to cancel and terminate this Agreement.

At the date of any termination of this Agreement for breach by LICENSEE, or as of the receipt by LICENSEE of notice of such termination, LICENSEE shall immediately cease using any of the Licensed Technology and return all Licensed Products to INNOVATIVE; provided, however, that LICENSEE may dispose of any Licensed Products actually in the possession of LICENSEE prior to the date of termination, subject to LICENSEE's paying to INNOVATIVE the running balances in accordance with this Agreement and otherwise complying with the terms of this Agreement.

No termination of this Agreement shall constitute a termination or a waiver of any rights INNOVATIVE has against LICENSEE accruing at or prior to the time of such termination.

In addition to any and all other remedies available to INNOVATIVE under law or equity, any of the events specified below shall immediately, upon written notice by INNOVATIVE, terminate this Agreement. The events of LICENSEE, the occurrence of which shall constitute termination for cause are as follows: (a) Sells Products outside the Licensed Territory; (b) remains in default of any payment obligations to

INNOVATIVE after 30 days written notice of breach by INNOVATIVE; (c) develops, sells, leases, rents or otherwise promotes equipment, products or supplies of another manufacturer which are similar to or which compete with any of the products; (d) continues in material violation of any other term or condition of this Agreement, or engages in any conduct which is detrimental to the INNOVATIVE name or its Patents, trademarks or other Intellectual Property rights; (e) Purports to transfer its rights under this Agreement or transfers the beneficial ownership or control of its business; and/or (f) becomes the subject of a bankruptcy proceeding, makes a general arrangement with creditors, has a receiver appointed, becomes insolvent, goes into liquidation, or becomes, in INNOVATIVE' reasonable judgment so financially unstable that it would be in the best interest of INNOVATIVE to terminate this Agreement; (g) directly or through any agent perpetrates fraud upon INNOVATIVE or any INNOVATIVE customer(s) in the course of this Agreement. Neither party shall by reason of the termination of this Agreement be liable to the other for compensation of damages on account of the loss of present or prospective profits, or commissions on sales or anticipated sales, or expenditure, investments, or commitments made in connection therewith, or in connection with the establishment, development or maintenance of the selling representation hereunder. This shall not be deemed to constitute a waiver of any other claim which INNOVATIVE may have against the LICENSEE; and provided further, that the acceptance of any sales order by INNOVATIVE after the termination of this Agreement shall not be construed as a renewal of extension of this Agreement or as a waiver of termination.

### GOVERNMENTAL COMPLIANCE

During the term of this Agreement, LICENSEE shall, at all times, comply with all laws that may control the manufacture, use, sale, marketing, distribution and other commercial exploitation of the Licensed Technology and Licensed Products or any other activity undertaken pursuant to this Agreement.

### GOVERNING LAW AND DISPUTE RESOLUTION

Governing Law and Dispute Resolution. The laws of the state of California govern this Agreement, without reference to any conflict of laws provision(s). All disputes and controversies related to this Agreement and the transactions contemplated by this Agreement whether sounding in tort or contract shall




## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

be determined exclusively by binding mediation/arbitration ("med/arb") in accordance with the then current commercial dispute procedures of the American Arbitration Association, and will be conducted only in the county of San Diego, California. The arbitration shall be "self-executing," such that no order to compel by any court is necessary to enforce compliance with the terms of this paragraph against a party who declines to voluntarily participate in the AAA procedure. Should one of the parties fail to respond to a request to arbitrate or otherwise decline to participate in the procedure, the AAA administration shall appoint a neutral arbitrator who is empowered by this paragraph to entertain evidence from the participating party and enter a binding award accordingly. The Parties expressly submit to the jurisdiction of said San Diego arbitrator, and voluntarily waive any right to assertion of the principle of "inconvenient forum." The Parties waive any rights either might otherwise have to consequential, multiple or punitive damages. The Parties each expressly forever waive any right to trial by jury, or to any appeal of the arbitrator's decision. The prevailing party in any such dispute shall be entitled to attorneys' fees and costs at the discretion of the arbitrator, and the award of the arbitrator may be rendered as a judgment by any San Diego based state or federal court.

### CONFIDENTIALITY

Confidentiality.
LICENSEE agrees to maintain the Licensed Technology in confidence, and to use the same only in accordance with this Agreement. The foregoing obligation of confidentiality shall survive termination of this Agreement.

Terms Confidential and Employee Instruction.
The terms of this Agreement shall be confidential and shall not be disclosed to any person or entity not a party to this Agreement, except the disclosing party's attorneys, accountants, and investors who are bound by the confidentiality provisions set forth herein, unless prior written consent is obtained from the other party, or unless a court or administrative agency of the United States or a state thereof orders such disclosure, provided, however, that in the event that such disclosure is required, the parties will use good faith efforts to maintain the confidentiality of any terms of this Agreement which are not so required to be disclosed. Furthermore, each of the parties agrees to instruct its respective employees as to the confidentiality of this Agreement.

### SHIPMENT

Shipment
Products will be shipped F.O.B. / Ex-factory from INNOVATIVE's designated manufacturing or warehouse facility. INNOVATIVE will not be liable for any delay in shipment or other damage suffered by LICENSEE from any cause beyond INNOVATIVE's reasonable control. INNOVATIVE will retain title to all Products until it receives payment, but LICENSEE will bear all risks of Product casualty or loss and any expense related thereto from the time Products are delivered by INNOVATIVE to the carrier for shipment to LICENSEE. LICENSEE acknowledges that it is hereby advised by INNOVATIVE to purchase insurance to protect itself from this assumed risk of loss. LICENSEE must make claims for any damages that are apparent at the time of delivery within 3 business days in writing to the shipper and to INNOVATIVE; all other claims for damaged goods or LICENSEE must make shortages in writing within five business days after receipt of shipment.

Returns
LICENSEE shall not be entitled to return any conforming Licensed Products to INNOVATIVE without INNOVATIVE's prior written consent. Any Licensed Products returned to INNOVATIVE must be in its original sealed container, unopened and unused, with all accompanying documentation intact, and must be Licensed Products that INNOVATIVE continues to carry in its inventory. Should INNOVATIVE determine to grant permission to the LICENSEE to return Licensed Product, LICENSEE will pay a minimum 15 percent restocking charge on any Products returned to INNOVATIVE, and will pay all associated shipping, tax and tariff costs.

Excusable Delay
INNOVATIVE will not be liable for any failure or delay in the delivery of Licensed Products due to circumstances beyond its reasonable control, such as natural catastrophe, fire, war, riot or civil unrest, strike, lockout or other labor disturbance, shortage or unavailability of materials, components or transportation facilities, or any act, refusal to act, regulation, order or intervention of governmental authorities.

### INSURANCE

Insurance.
LICENSEE shall for so long as LICENSEE manufactures, uses or sells any Licensed Product(s), maintain in full force and effect policies of (i)

CONFIDENTIAL LICENSING AGREEMENT
BY AND BETWEEN INNOVATIVE MEDICAL SERVICES
AND NICKEL LTD.
PAGE 7



## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

worker's compensation and/or employers' liability insurance within statutory limits, (ii) general liability insurance (with broad form general liability endorsement) with limits of not less than ten million dollars ($10,000,000.00 USD) per occurrence with no annual aggregate and (iii) products liability insurance, with limits of not less than two million dollars ($2,000,000.00 USD) per occurrence with no annual aggregate. Such coverage(s) shall be purchased from a carrier or carriers deemed acceptable to INNOVATIVE with no annual aggregate and shall name INNOVATIVE as an additional insured. LICENSEE shall provide to INNOVATIVE copies of said policies of insurance.

### GENERAL TERMS AND CONDITIONS.

#### Entire Agreement.
This Agreement memorializes and constitutes the final expression and the complete and exclusive statement of agreement and understanding among the parties with regard to the subject matter hereof. All negotiations, agreements, proposed agreements, covenants, representations and warranties, express and implied, oral and written, of the parties with regard to the subject matter hereof are contained herein (except as to any letter agreement executed concurrently herewith). No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by either party to the other with respect to the subject matter of this Agreement. All prior and contemporaneous conversations, negotiations, possible and alleged agreements and representations, covenants, and warranties with respect to the subject matter hereof are waived, merged herein and superseded hereby. This is an integrated agreement.

#### Indemnification.
LICENSEE agrees that it will defend, indemnify and hold harmless the INNOVATIVE, its faculty members, scientists, researchers, employees, officers, shareholders, attorneys, trustees, directors, and agents and each of them (the "Indemnified Parties"), from and against any and all claims, causes of action, lawsuits or other proceedings filed or otherwise instituted against any of the Indemnified Parties related directly or indirectly to or arising out of the design, process, manufacture, or use by any person or party of the Licensed Technology, the Licensed Technology or any other embodiment of the Licensed Technology even though such claims, causes of action, lawsuits or other proceedings and the costs (including attorney's fees) related thereto result in whole or in part from the negligence of any of the Indemnified Parties. Notwithstanding any provisions

herein to the contrary, the INNOVATIVE shall indemnify LICENSEE for any claims for injuries to persons or property damage which occur on the INNOVATIVE premises or premises under the exclusive control of the INNOVATIVE. LICENSEE will also assume responsibility for all costs and expenses related to such claims and lawsuits for which it is obligated to indemnify the Indemnified Parties pursuant to this Paragraph, including, but not limited to, the payment of all reasonable attorneys' fees and costs of litigation or other defense.

#### No Agency or Legal Representative Status.
The parties are and at all times shall be and remain independent contractors as to each other. No joint venture or other relationship which would impose liability upon either party for any act or failure to act of the other party shall be created or implied hereby or herefrom. This Agreement does not and is not intended to constitute LICENSEE as the agent or legal representative of INNOVATIVE. Except as provided herein, neither party is granted any express or implied right or authority by the other party to assume or create any obligation or responsibility on behalf of or in the name of the other party, or to bind the other party in any manner or thing whatsoever. Nothing in this Agreement shall be construed to create a relationship of joint venture, partnership, fiduciary or other similar relationship between the Parties.

#### Exhibits.
The following exhibits are attached to the Agreement and incorporated by reference:
Exhibit A: Definition of Territory for Licensed Product(s)

#### Attorneys' Fees and Court Costs.
In the event that it becomes necessary to initiate legal proceedings by either party to enforce any of the terms or provisions of this Agreement, to recover damages, or to obtain any relief, at law or in equity, the prevailing party shall be entitled to recover, in addition to any relief afforded or obtained in such proceeding, reasonable attorneys' fees and costs as well as any court costs incurred by such party in connection with any such action(s).

#### Waiver and Severability.
The failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of that provision or of the right of the party to thereafter enforce that or any other provision. In case any provision of this Agreement is held to be invalid, unenforceable or illegal, the provision will be severed from this Agreement and such invalidity, unenforceability or illegality will not affect any other

## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

provision of the Agreement. Any specific right or remedy contained in this Agreement shall not be exclusive, but shall be cumulative upon all other rights and remedies hereunder or otherwise allowed or allowable under applicable law.

**Representation.**
This document is the result of negotiations between parties, each of whom was represented or had the opportunity to be represented in the transaction, and has had the opportunity to have had the transactional documents reviewed by counsel of their own choice.

**No Assignment.**
This Agreement or any part thereof may not be transferred or assigned by LICENSEE without the written consent of INNOVATIVE.

**Survival of Representations And Warranties.**
The representations and warranties will survive and continue in full force and effect notwithstanding the close of escrow or early termination of this Agreement.

**Additional Documents and Acts.**
LICENSEE hereto agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**Counterparts.**
This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.

**Severability.**
In the event that any covenant, condition or other provision herein contained is held to be invalid, void or illegal by any court of competent jurisdiction the same shall be deemed severable from the remainder of this Agreement and, shall in no way affect, impair or invalidate any other covenant, condition or other provision herein contained. If such condition, covenant or other provision shall be deemed invalid due to its scope or breadth, such covenant, condition or other provision shall be deemed valid to the extent of the scope or breadth permitted by law.

**Notices.**
All notices, as well us any reports or statements, required hereunder shall be deemed to be duly given on the date same is mailed or sent and/or acknowledged via hand delivery, facsimile or reliable overnight delivery to the party concerned at the following addresses:

If to INNOVATIVE:
Innovative Medical Services
1725 Gillespie Way
El Cajon, California 92020
Attn: Michael L. Krall

If to LICENSEE:
Nickel, Ltd.
146 rue du Chateau
75014 Paris, France
Attn: Emile Gourian

**Reformation.**
All parties hereby agree that neither party intends to violate any public policy, statutory or common law, rule, regulation, treaty or decision of any government agency or executive body thereof of any country or community or association of countries; that if any word, sentence, paragraph or clause or combination thereof of this Agreement is found, by a court or executive body with judicial powers having jurisdiction over this Agreement or any of its Parties hereto, in a final unappealed order to be in violation of any such provision in any country or community or association of countries, such words, sentences, paragraphs or clauses or combination shall be inoperative in such country or community or association of countries, and the remainder of this Agreement shall remain binding upon the Parties hereto.

**Force Majeure.**
No liability hereunder shall result to a party by reason of delay in performance caused by force majeure, that is, circumstances beyond the reasonable control of the party, including, without limitation, acts of God, fire, flood, war, civil unrest, labor unrest, terrorist acts, shortage of or inability to obtain material as equipment.

**Section Headings.**
The section headings used in this Agreement are intended for convenience only and shall not be deemed to supersede or modify any provisions.

**Controlling Document**
This Agreement and its terms and conditions shall control as to any conflicts in language between this Agreement and any other agreement between the parties.

CONFIDENTIAL LICENSING AGREEMENT
BY AND BETWEEN INNOVATIVE MEDICAL SERVICES
AND NICKEL LTD.
PAGE 8



## Exhibit E to Umbrella Agreement
## by and between IMS and Nickel

This Agreement shall be binding upon and shall inure to the benefit of the INNOVATIVE and its assigns and successors in interest, and shall be binding upon and shall inure to the benefit of LICENSEE and the successor to all or substantially all of its assets or business to which this Agreement relates, but shall not otherwise be assignable or assigned by LICENSEE without prior written approval by the INNOVATIVE being first obtained.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement in multiple originals by their duly authorized officers and representatives on the respective dates shown below, but the terms hereof are effective as of the Agreement Date.

INNOVATIVE MEDICAL SERVICES

Dated: January 15 2003           By: _____

Michael L. Krall, President / CEO

NICKEL, LTD.

Dated: January___, 2003           By: _____

Emile E. Gouiran, Corporate Secretary

\* \* \*

**NICKEL LTD (NICKEL)**
A New Jersey Corporation

AND

**INNOVATIVE MEDICAL SERVICES INC (IMS)**
A California Corporation

The Territory defined as "Europe" shall include members of the European Community and notably, the following countries or derivatives thereof as may in the future result from any political or other redesign :

| | | | | |
|---|---|---|---|---|
| Iceland | Norway | Latvia | Bulgaria | Albania |
| Scotland | Sweden | Lithuania | Romania | Greece |
| Ireland | Finland | Germany | Ukraine | Turkey |
| England | Poland | Slovakia | Bosnia Her/ | Croatia |
| Wales | Estonia | Hungary | Serbia | Macedonia |
| Austria | Lichtenstein | Switzerland | Denmark | The Netherlands |
| Luxemburg | Belgium | France | Italy | Andorra |
| Monaco | Czek Rep | Spain | Portugal | Malta |
| Greenland | Cretia | Cyprus | | |

and all possessions and territories of the aforementioned countries or derivatives thereof as may in the future result.

* * *

**NICKEL LTD (NICKEL)**
A New Jersey Corporation

**AND**

**INNOVATIVE MEDICAL SERVICES INC (IMS)**
A California Corporation

The Territory defined as "Europe" shall include members of the European Community and notably, the following countries or derivatives thereof as may in the future result from any political or other redesign :

| | | | | |
|---|---|---|---|---|
| Iceland | Norway | Latvia | Bulgaria | Albania |
| Scotland | Sweden | Lithuania | Romania | Greece |
| Ireland | Finland | Germany | Ukraine | Turkey |
| England | Poland | Slovakia | Bosnia Her/ | Croatia |
| Wales | Estonia | Hungary | Serbia | Macedonia |
| Austria | Lichtenstein | Switzerland | Denmark | The Netherlands |
| Luxemburg | Belgium | France | Italy | Andorra |
| Monaco | Czek Rep | Spain | Portugal | Malta |
| Greenland | Cratia | Cyprus | | |

and all possessions and territories of the aforementioned countries or derivatives thereof as may in the future result.



\* \* \*

NICKEL LTD (NICKEL)
A New Jersey Corporation

AND

INNOVATIVE MEDICAL SERVICES INC (IMS)
A California Corporation

The Territory defined as "Europe" shall include members of the European Community and notably, the following countries or derivatives thereof as may in the future result from any political or other redesign :

| | | | | |
|---|---|---|---|---|
| Iceland | Norway | Latvia | Bulgaria | Albania |
| Scotland | Sweden | Lithuania | Romania | Greece |
| Ireland | Finland | Germany | Ukraine | Turkey |
| England | Poland | Slovakia | Bosnia Her/ | Croatia |
| Wales | Estonia | Hungary | Serbia | Macedonia |
| Austria | Lichtenstein | Switzerland | Denmark | The Netherlands |
| Luxemburg | Belgium | France | Italy | Andorra |
| Monaco | Czek Rep | Spain | Portugal | Malta |
| Greenland | Cretia | Cyprus | | |

and all possessions and territories of the aforementioned countries or derivatives thereof as may in the future result.



# UMBRELLA AGREEMENT

---

### NICKEL LTD (NICKEL)
A New Jersey Corporation

### AND

### INNOVATIVE MEDICAL SERVICES INC (IMS)
A California Corporation

---

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

Exhibit ____

# TABLE OF CONTENTS
## UMBRELLA AGREEMENT

Umbrella Agreement..................................................................................................... 1
Exhibit "A" (1)................................................................................................ "A" (1) 1
Exhibit "A" (2)................................................................................................ "A" (2) 1
Super Distributor Agreement: Nickel Ltd. and Carline America Ltd. ..............................
Exhibit "B" (1)................................................................................................ "B" (1) 1
Exhibit "B" (2)................................................................................................ "B" (2) 1
Super Distributor Agreement Nickel Ltd. and Innovative Medical Services ......................
Exhibit "D".............................................................................................................. "D" 1
Exhibit "E".............................................................................................................. "E" 1
Exhibit "F" .............................................................................................................. "F" 1







# AGREEMENT

1

THE PARTIES

2

3    **NICKEL LTD**, a New Jersey Corporation having its principal and only place of
4  business at 146 rue du Château, 75014 PARIS FRANCE, hereinafter and for all
5  relevant purposes known as "NICKEL" who is represented for the present Agreement
6  by Helle MADSØ, Vice President ;

7  and

8    **INNOVATIVE MEDICAL SERVICES INC**, a California Corporation having its
9  principal and only place of business at 1725 Gillespie Way, EL CAJON CALIFORNIA
10  92020 USA, hereinafter and for all relevant purposes known as  "IMS" who is
11  represented for the present Agreement by its President and Chief Executive Officer,
12  Michael L. KRALL ;

13                         \*P R E A M B L E\*

14    ·· WHEREAS, the parties herein, have, with the availability of their respective
15  counsels and representatives, and for the last several months, engaged in numerous
16  tele-conferences, meetings, conversations and negotiations intent on investigating the
17  possibilities available for their association in a common endeavor committed to the

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature



2

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

18  furtherance of their collective goals, and in particular to the development and
19  exploitation of a business relationship and enterprise focused upon the distribution in
20  the United States and Europe as herein defined at Exhibit "D" and European
21  possessions and territories, of products developed for incorporation in lines similar or
22  derived from the product mixes currently marketed by each of the Parties, respectively,
23  and in connection therewith, to pursue and exploit coherent and supportive processes
24  for the marketing and distribution thereof, and,


25      WHEREAS, each of the parties is desirous of giving effect to the product of
26  these negotiations, each acknowledging having had ample and sufficient opportunity
27  to consider with any necessary professional or other assistance available, all of the
28  consequences related to their respective and/or collective mandatory obligations under
29  this Agreement, and every party acknowledging fully, that each shall and may properly
30  rely upon and form a justified expectation as to the benefit to be derived from the per-
31  formance by each Party, of each of their respective promises and obligations set forth
32  herein :


33      NOW THEREFORE, in consideration of the premise, and the sum of one or
34  more dollars duly paid and exchanged, receipt of which is hereby acknowledged, it is
35  agreed as follows:


36          BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK




                            UMBRELLA AGREEMENT
                 INNOVATIVE MEDICAL SERVICES "IMS"
                            NICKEL LTD "NICKEL"
        FINAL X In Two Duplicate Originals Intended for signature

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

37                              *WITNESSETH*

38                                        I
39                  ORGANIZATION OF DISTRIBUTION COMPANY
40                                  "NEWCO"

41        **Section 1.1:** The Parties, each for a respective and undivided interest of 50%,
42 agree to organize a corporation (NEWCO) upon the following terms, conditions, and
43 for the indicated purposes :

44        **Section 1.2:** The name of NEWCO shall be CARLINE AMERICA LTD, or if the
45 name is not available, any other name that the parties may mutually agree upon.

46        **Section 1.3:** NEWCO shall be organized in accordance with the laws of the
47 State of Nevada, United States of America. The principal place of business to be
48 registered  for "NEWCO" shall be 1725 Gillespie Way, El Cajon, California (USA).

49        **Section 1.4:** The purpose of NEWCO shall be, uniquely, to develop and exploit
50 as an on-going business enterprise, the whole of the rights consented to it in a certain
51 Super Distribution Agreement entered into between the said corporation and NICKEL
52 (Exhibit "A"), and provided wholly consistent therewith, to conduct all such other lawful
53 acts or activities for which authorized corporations may be organized under the laws
54 of the State of Nevada, United States of America[1].

---

[1] Including for example ;
    a. The purchase, reception, ownership, improvement and use of real or personal property, or any
interest in real or personal property, wherever situated, and the sale, conveyance, lease, exchange, transfer,
mortgage, or pledge of any of NEWCO's, real property and other assets, or any interest in NEWCO's real
property and other assets.

                                        UMBRELLA AGREEMENT
                              INNOVATIVE MEDICAL SERVICES "IMS"
                                        NICKEL LTD "NICKEL"
                    FINAL X In Two Duplicate Originals Intended for signature

4

06/10 '03 11:11   TEL 003▪▪422316          NICKEL FINANCE                          ☰21

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

---

b. Engage in a general mercantile, industrial, investing and or trading business; devise, invent, manufacture, fabricate, assemble, install, service, maintain, alter, buy, sell, import, export, license as licensee or licensor, lease as lessee or lessor, distribute, job, enter into, negotiate, execute, acquire and assign contracts in respect of, acquire, receive, grant, and assign licensing arrangements, options, franchises and other rights in respect of, and generally deal in and with, at wholesale and retail, as principal, and as special or general agent, representative, broker, factor, merchant, distributor, jobber, advisor, and in any other lawful capacity, goods, wares, merchandise, commodities, and unimproved, improved, finished, processed, and other real, personal and mixed property of any and all kinds, together with the components, resultants and by-products thereof.

c. Apply for, register, obtain, purchase, lease, take licenses in respect of or otherwise acquire, and to hold, own, use, operate, develop, grant licenses and immunities in respect of, manufacture invent and introduce, sell, assign, mortgage, pledge or otherwise dispose of, and in any manner deal with and contract with reference to i) inventions, devices, formulae, processes and any improvements and modifications thereof; ii) letters patent, patent rights, patented processes, copyrights, designs and similar rights, trademarks, trade names, trade symbols, and other indications of origin and ownership granted by or recognized under the laws of the United States of America, any state or subdivision thereof, and any commonwealth, territory, agency or instrumentality of either country, and all rights connected therewith or appertaining thereto; iii) franchises, licenses, grant and concessions.

d. Acquire by purchase, exchange or otherwise, all or any part of, or any interest in, the properties, assets, business and good will of any one or more persons, firms, associations, or corporations here before or herein after engaged in any business for which a corporation may now or hereafter be organized; pay for the same in cash, property or in NEWCO's own or other securities; hold, operate, reorganize, liquidate, sell, or in any manner dispose of the whole or any part thereof; and in connection therewith, assume or guaranty performance of any liabilities, obligations, or contracts of such persons, firms, associations or corporations, and to conduct the whole or any part of any business thus acquired.

e. Lend money in furtherance of NEWCO's purposes and invest and reinvest NEWCO's funds from time to time, to such extent, to such persons, firms, associations, corporations, governments or agencies or instrumentalities thereof, and on such terms and on such security, if any, as the Board of Directors may determine.

f. Make contracts of guaranty and suretyship of all kinds and indorse or guarantee the payment of principal, interest, or dividends upon, and guaranty the performance of sinking funds or other obligations of, any securities, and guaranty in any way permitted by law the performance of any of the contracts or other undertakings in which NEWCO may otherwise be or become interested, of any persons, firms, associations, corporations,, government or agency or instrumentality thereof, or of any other combination, organization, or entity.

g. Borrow money without limit as to amount and at such rates of interest as NEWCO may determine; from time to time issue and sell NEWCOs notes, bonds, indentures, and other obligations, in amounts; on terms and conditions, for purposes and for prices, now or hereafter permitted by the laws of the jurisdiction in which NEWCO shall seek to do so, and as the Board of Directors may determine, and as the relevant laws shall allow; and to secure any of it's obligations by mortgage, pledge, or other encumbrance of all or any of it's property, franchises and income.

h. Promote or manage other corporations of any type or kind; and participate with others in any

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

5

08/10 '03 11:11  TEL 0033. .22316     NICKEL FINANCE                     @22

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

55      **Section 1.5:** NEWCO's duration shall be perpetual if such a duration is·
56 permissible, or for the longest term allowed under the laws of the incorporating
57 jurisdiction.

58          **Section 1.6:** NEWCO's principal office shall be located at IMS' offices : 1725

corporation, partnership, limited partnership, joint venture, or association of any kind, or in any transaction,
undertaking or arrangement which NEWCO would have power to conduct by itself, whether or not such
participation involves sharing or delegating control with or to others.
        i. Draw, make, accept, indorse, discount, execute, and issue promissory notes, drafts, bills of
exchange, warrants, bonds, debentures, and other negotiable and transferable instruments and evidence of
indebtedness, whether secured by mortgage or otherwise, as well as to secure the same by
mortgage or otherwise so far as may be permitted by the laws of any other relevant jurisdiction.
        j. Organize as an incorporator, or cause to be organized under the laws of any country, or of any
commonwealth, territory, agency or instrumentality, a corporation or corporations for the purpose of conducting
and promoting any business or purpose for which corporations may be organized, and to dissolve, wind up,
liquidate, merge or consolidate any such corporation or corporations, or to cause the same to be dissolved,
wound up, liquidated, merged or consolidated.
        k. Promote and exercise all or any part of NEWCO's purposes and powers in any and all parts of the
world, and conduct NEWCO's business in all or any of it's branches, as principal, agent, broker, factor,
contractor, and in any other lawful capacity, either alone or through or in conjunction with any corporations,
associations, partnerships, firms, trustees, syndicates, individuals, organizations, and other entities in any part
of the world, and, in conducting NEWCOs business and promoting any of it's purposes, maintain offices, brokers
and agencies in any part of the world, make and perform any contracts and do any acts and things and carry
on any business and exercise any power and privilege suitable, convenient or proper for the conduct, promotion
and attainment of any of the businesses and purposes herein specified or which at anytime may be incidental
thereto or may appear conducive to or expedient for the accomplishment of any of such businesses and
purposes and which might be engaged in or carried on by a corporation incorporated or organized under the
laws of the United States, and have and exercise all of the powers conferred by such laws upon corporations
incorporated or organized under such laws.
        l. This Section including the several footnotes thereof, shall be construed both as intended purposes
and powers and each as an independent purpose and power. The enumeration of specific purposes and powers
shall not be held to intend a limitation or restriction in any manner of the purposes and powers specified of the
corporation to be formed, and the purposes and powers specified shall not be limited or restricted by reference
to, or interference from the terms of any provision of this Section or of any or all of it's footnotes; provided that
the corporation shall not conduct any business, promote any purpose, or exercise any power or privilege in
violation of its agreements with NICKEL, or within or without the United States which under its laws or that of
any relevant jurisdiction a corporation may not lawfully conduct, promote or exercise.

                                UMBRELLA AGREEMENT
                    INNOVATIVE MEDICAL SERVICES "IMS"
                              NICKEL LTD "NICKEL"
              FINAL X In Two Duplicate Originals Intended for signature

6

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

59 Gillespie Way, EL CAJON CALIFORNIA 92020 USA. IMS will obtain such landlord
60 permission and perform such regulatory filings as may be required to properly domicile
61 NEWCO at its offices, but such location may be changed from time to time as
62 NEWCO's board of directors, in the strict best interest of the corporation, may direct.

63      Section 1.7: The corporate officers of NEWCO shall consist of a Chairman of
64 the Board, a President, ~~and~~ a Corporate Secretary. The ~~Chairman~~ *President* shall always be
65 occupied by an individual chosen from designates of NICKEL, ~~and the Presidency by~~
66 ~~an individual chosen from designates of IMS~~. The Corporate Secretary shall be chosen
67 from designates of both of the Parties. ✱ ~~All three of these senior executives are~~
68 ~~contributed to the business of NEWCO by the Parties, and the Parties shall not be~~
69 ~~entitled to reimbursement therefor~~. These same executives shall not be entitled to
70 remuneration of any kind from NEWCO.

*a Treasurer* *and Treasurer*

71      Section 1.8: NEWCO shall have four directors, all of whom shall serve in the
72 best interest of the corporation and without compensation. A forum requires the
73 unanimous presence of all directors. Meetings and consequently the presence of all
74 directors, may be organized in any manner consistent with efficiency and modern
75 communication enabling a forum. Each of the shareholders shall appoint two directors
76 and both shareholders shall join to vote such appointees. All directors shall serve one
77 year terms and exercise one vote.

*The Chairman shall always be chosen by NICKEL.*

78      Section 1.9: IMS will devote substantially all of the management and
79 administrative time necessary, to the productive and successful development of the
80 business(es) and commercial enterprises established and undertaken under the terms
81 of this Agreement as and for NEWCO.  IMS is primarily responsible for providing and

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

*and Treasurer*

✱ *The President and Corporate Secretary are contributed to the business of NEWCO by the Parties, and the Parties shall not be entitled to reimbursement therefor.*

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

82 ensuring the management and operations function to and for NEWCO[2].

83        **Section 1.10:** The authorized shares of "NEWCO" shall consist of 100,000
84 shares. Each of the Parties will receive 30,000 such shares at no par value. Each of
85 the Parties will contribute $3,000 in equity for initial corporation formation. Equity
86 contribution will be made into a corporate bank account established for "NEWCO" no
87 later than one week before the filing of the certificate of incorporation.

88        **Section 1.11:** The Parties shall each advance to NEWCO the required funds
89 in equal amounts to pay for all pre-approved, reasonable and competitively monitored
90 expenses incurred in organizing NEWCO, filing the Carline® trademark in its name for
91 the US, establishing compulsory product liability insurance, but excluding legal fees for
92 the preparation of this Agreement which shall be paid by the each of the Parties to their
93 own counsels respectively. NEWCO will reimburse the parties in whole or on a prorata
94 as the case may require for these listed expenses  - providing however, that no
95 expense, disbursement, or other impedimenta shall for this or at any time be
96 reimbursable from NEWCO to either of the Parties, on account of expenses incurred
97 on its behalf, to the extent that the charge and reimbursement, would have the effect
98 of operating a loss for NEWCO, or in the case of a capitalized item, depriving it, in the
99 opinion of its Board of Directors, of a necessary and essential cash resource.
100 Notwithstanding the foregoing, the payment by NEWCO for goods sold to it by NICKEL,
101 shall not be affected by this provision, and the sale by it of goods intended for resell
102 shall not be construed as a contribution under the provisions of this Agreement.

---

[2]  IMS shall make available all necessary resources, manpower, skill, knowhow, offices, utilities,
warehousing and services related to he solicitation of and development of a comprehensive distribution
network for Clean Plus® products in the United States, as and for the market segment and activity sectors
indicated in the Super Distribution Agreement.

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

8

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

103      **Section 1.12:** The parties will vote their respective interests in NEWCO to
104  ensure the adoption and ratification by NEWCO of the terms and conditions of this
105  Agreement and of the separate and distrinct Super Distribution Agreement between
106  NEWCO and NICKEL (Exhibit "A").


107      **Section 1.13 :** In the event of a discontinuation or dissolution of either of the
108  Parties during the term of NEWCO's existence, all of that Party's rights, title and
109  interest in NEWCO shall be sold, assigned and transferred to the surviving Party, and
110  such surviving Party agrees to purchase the same, at a price that shall be determined
111  by adjusting NEWCO's balance sheet for the purpose, as follows:

112      a. Good will and other intangible property shall be deemed to be of no value,
113  unless the same shall have been acquired and paid for in cash; and, in such event, if
114  any, the same shall be figured at the purchase price;

115      b. Furniture, fixtures, machinery, etc. on hand, at the time of the making of the
116  latest semiannual balance sheet, shall appear of, or be taken as of, the value at which
117  the same shall appear in such semiannual balance sheet, net of depreciation.

118      c. Current account receivables, shall be taken in their face value, less discount
119  (if the accounts are carried gross on the books), and less a reserve of the higher of the
120  actual delinquency rate, or six (6%) percent for problem collections or uncollectible
121  accounts, regardless of the actual status of such accounts;

122      d. All merchandise, whether in process of manufacture, in transit, in storage, or
123  otherwise, shall be taken in at cost or market value, whichever shall be lower at that
124  time;

125      e. Any securities acquired by NEWCO shall be taken in at the market value;

126      f. All taxes and assessments of whatever kind and nature, shall be apportioned
127  and charged as a liability of the latest semiannual balance sheet date.

128      g. Stockholders equity shall be re-determined for these purposes after the stated
129  adjustments.


UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

* The surviving Party shall have the first right of refusal to purchase all of the
discontinued party's rights, title and interest in "NEWCO." In the event of such
a purchase, the discontinued party's ownership and/or other rights in "NEWCO" 9
shall be sold, assigned and transferred to the surviving Party at fair market
value, but in no event less than a price that shall be determined by
"NEWCO"'s balance sheet for the purpose, as follows

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

130      h. The percentile ownership of the disolved or discontinued Party shall be
131  valued, and the price determined, on the basis of that percentile of stockholders' equity
132  as re-determined after application of the above formulated mechanism for the purpose.

133      **Section 1.14** : Upon tender of payment, or payment being made to the duly
134  qualified personal representative or representatives of the discontinued or dissolved
135  Party of the amount of the purchase price for his interest or share in NEWCO, such
136  representative or representatives shall make, execute and deliver to the surviving party,
137  any and all instruments that may be necessary or desirable to transfer to such surviving
138  parties, in accordance with its instructions, all of the rights, title and interest of the
139  personal representative or representatives of the discontinued or disolved Party in and
140  to NEWCO.

141      **Section 1.15:** IMS covenants and agrees that it will not, at anytime within (3)
142  three years from the date of this Agreement, within fifty miles of any office or facility
143  operated by NEWCO and/or NICKEL, and with respect to any product entitled to be
144  distributed under the seal, label, certification or appellation of the products distributed
145  by NEWCO under cover of its Super Distribution Agreement, and provided that
146  NEWCO and/or NICKEL shall continue to exist as a going concern, or be in existence
147  for purposes of consolidation, sale, liquidation or any reason, directly or indirectly, in
148  any manner, enter into, or be engaged in, or financially or otherwise assist any person,
149  firm, association or corporatioin in entering into, developing or carrying on any business
150  that consists of, or relates or pertains, in any way, to the development, exploitation, of
151  products, however available, of various and all kinds, or in any business that will
152  interfere or compete with the business of NEWCO or that of NICKEL, its sucessors or
153  assignes, relating to similar activities, or to the development and exploitation of any
154  related actvities, nor shall it, in any manner have, solicit or accept the custom, trade or
155  business of any customer of NEWCO or NICKEL, nor do any other act that shall

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

10

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

156 prejudice NEWCO or NICKEL, and instead such parties agree that they will in every
157 respect and throughout such time period, cooperate to enable NEWCO and NICKEL
158 to obtain and enjoy the entire benefits and advantages of its business, and of its
159 bargain hereunder.

160    AVAILABILITY
161    CONTRIBUTION OF MANAGEMENT, OTHER ASSETS AND
162    RESOURCES BY IMS

163    **Section 2.1** : In order to facilitate the administration of the common endeavor,
164 and in consideration of the diverse obligations and promises of the Parties hereunder,
165 and to enhance the benefits and synergies to be derived from an exploitation of the
166 Super Distribution Agreement (Exhibit "A") entered into by and between NEWCO and
167 NICKEL as  contemplated herein, and/or for any other reason consistent with the
168 purposes, be they at this time expressed, contemplated or intended, but all generally
169 expected to be consistent with activities intent on promoting the common purpose, IMS
170 has agreed as follows:
171    a.  IMS shall in addition to the management contemplated elsewhere in this
172 Agreement, make available to NEWCO, as necessary and as the situation may dictate,
173 and using its best efforts, buildings and facilities to be employed for office
174 administration, preparation, storage, packing, labelling and deployment of goods,
175 including every element and component of logistical / distribution production and
176 administration, all tools, machine tools, packing tools, filming tools, special tools, jigs,
177 supplies, equipment of all kinds and for all purposes relevant in the operation of a
178 distribution and logistical concern, stocks and inventories of packing materials, pack-
179 aged, un-packaged, completed or in process of completion, all parts and supplies, all
180 formulae, trade lists and information, all books of entry and account, the benefit of all
181 contracts relating to the business of NEWCO and notably to that of the business of

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

182 Super Distribution of Clean Plus® products, and all other interests and rights of every
183 form and nature, and especially including the goodwill and business contacts of in and
184 to the business of distribution in the automotive after-care market segment, and to the
185 name CARLINE AMERICA LTD or any derivative, and to all trade names and marks
186 (whether registered or not) used or employed or contemplated to be used or employed
187 in any manner in connection with the business of NEWCO as a Clean Plus® Super
188 Distributor as that business is defined and more specifically provided for in the Super
189 Distribution Agreement existing between NEWCO and NICKEL and herein set forth at
190 Exhibit "A".

191        ii) As these currently or may come to exist, all of the records, files, information,
192 clients, customers, marketing contracts, rights, titles and interests to any past or recent
193 sales processes developed, including methods of sales and marketing, negotiation,
194 distribution, storage and related activities, in and for the exploitation of the business of
195 Super Distribution of Clean Plus® products in the automotive after-care market
196 segment in the United States as defined and specified in the Super Distribution
197 Agreement between NEWCO and NICKEL.

198        iii) All of the rights, title and interest in and to the name CARLINE AMERICA
199 LTD, CARLINE, or any other similar name used by IMS in past or current activities, IMS
200 representing for all purposes, that it has (or will have) performed all of the necessary
201 administrative and/or recording processes (including filing for the national trademark
202 CARLINE®) to occur to ensure it's property, or that it has caused registration and / or
203 recording in the name of NEWCO directly, and it specifically represents that it or
204 NEWCO has full and undisputed title thereto; Together with any interest, title or right
205 in and to any renewal or extension of the protected status that may be granted in
206 connection with the continued utilization of such name(s), the right hereby assigned to
207 the name CARLINE AMERICA LTD, and/or CARLINE® being for the unconditional use
208 and exploitation, including licensing thereof of CARLINE AMERICA  LTD., it's
209 successor and assign.

> UMBRELLA AGREEMENT
> INNOVATIVE MEDICAL SERVICES "IMS"
> NICKEL LTD "NICKEL"
> FINAL X In Two Duplicate Originals Intended for signature

12

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

210  **Section 2.2:** To the extent not inconsistent with any IMS filing with the Securities
211 and Exchange Commission, IMS warrants and represents that (a) it has good and
212 marketable title in and to the equipment, properties and other assets made available
213 for the use of NEWCO under the terms and conditions of this Agreement; (b) that no
214 other party has any right, title or interest therein susceptible of impairing the unfettered
215 exploitation of same by NEWCO, except and unless as specifically set forth in this
216 Agreement; (c) that no assignment, transfer, conveyance, or sale of any interest in the
217 said equipment, properties and other assets (or any of them) has been made by IMS,
218 and (d) that none of the equipment, properties and other assets are subject to any
219 mortgages, security interests, lien, charge, or other encumbrance which would have the
220 purposes of prohibiting or frustrating the free use and exploitation of the resource by
221 NEWCO.

222           III
223 ABILITY OF NEWCO TO REIMBURSE CERTAIN CONTRIBUTIONS FROM IMS
224         AND NICKEL

225  **Section 3.1:** This Agreement contemplates that with the exception of goods
226 purchased from NICKEL for resale and intended to be be sold in the performance of the
227 regular business of NEWCO's Clean Plus® Super Distribution activity, all management
228 and resources necesssary for the operation of NEWCO shall, as provided for herein,
229 be made available to NEWCO by the Parties.

230  **Section 3.2:** NEWCO, may at anytime disburse on a prorata certain refunds of
231 expenditures incurred by either or both of the Parties as and for the clearly
232 demonstrated benefit of NEWCO, providing (a) the sum requested is the lower of the
233 fair market value of the service, good or benefit obtained, or the actual amount
234 expensed therefor, and (b) that the expenditure when booked, shall not operate to

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

13

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

235  create a loss in the operations of NEWCO, or in respect to a capitalized item, reduce
236  NEWCO's capital or cash resources to an amount such as to render NEWCO insolvent
237  or with a capital so inadequate as to frustrate or prevent the expeditious and efficient
238  performance of its primary business purpose and operation as a Clean Plus® Super
239  Distributor under its contract with NICKEL.

240      **Section 3.3** : Nothing herein contained is intended to operate as a restriction to
241  the freedom of NEWCO's Board of Director's to declare a distribution in kind, cash or
242  stock, or the reimbursement to a Party whenever such action is not inconsistent with
243  the provisions and intentions of Section 3.2 above.

244                               IV
245            CONTINUING CONTRIBUTIONS AND INCREASES
246                   IN THE CAPITAL OF NEWCO.

247      **Section 4.1:** The Parties acknowledge and concur on the likely necessity for the
248  continued expansion and increase in the asset base and capital of NEWCO and
249  consequently agree to promote, in all their dealing as shareholders and in their inter-
250  face or participation with the board of directors of NEWCO, to favor any process that
251  would have the effect of retaining earnings and augmenting capital, providing however,
252  that nothing herein contained shall operate to conclusively prejudice the better fiscal
253  and accounting treatment requisite of a board of director's charge in respect to
254  shareholders.

255      **Section 4.2:** Upon any approved program of re-capitalization, further
256  capitalization, or any similar form of equity offering by NEWCO, each of the Parties
257  shall cooperate in any reasonable way to promote the full subscription of such offering.

                                UMBRELLA AGREEMENT
                      INNOVATIVE MEDICAL SERVICES "IMS"
                              NICKEL LTD "NICKEL"
                 FINAL X In Two Duplicate Originals Intended for signature

14

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

258                                    V
259                    ISSUE AND SALE OF WARRANTS
260                              IN IMS

261        **Section 5.1:** As and for full and complete payment for the rights acquired by IMS
262  under the Super Distribution Agreements set forth at Exhibit "A" and "B" hereof, and in
263  consideration of those other rights contained in the within Agreement, and the delivery
264  or tender to IMS of a duplicate original of the present contract signed by NICKEL
265  coupled to the delivery or tender to NEWCO of a duplicate original of the Super
266  Distribution Agreement (Exhibit "A" hereof) and to IMS of a duplicate original of the
267  Super Distribution Agreement (Exhibit "B" hereof) both signed by NICKEL, IMS will
268  issue and sell to NICKEL ~~and/or its designees,~~ for $ 1,00 good and sufficient and valid
269  consideration, in equal or varying quantities, five (5) year warrants to purchase such
270  number of shares as shall on vesting, in the aggregate equal five percent (5%) of the
271  number of fully diluted shares of Common Stock of IMS, at a price of $ .0001 per
272  warrant (The Warrants). The Warrants shall have one-time piggyback and demand
273  registration rights at the expense of IMS (Exhibit "C"). IMS will cause, at its own cost
274  and expense, the preparation, execution and filing of any and all instruments, and to
275  do and perform any and all acts, that may be necessary or desirable in order to register
276  and vest onto NICKEL ~~and/or its designee(s)~~ under the Securities Act of 1933, as
277  amended, the warrants to be issued hereunder.

278        **Section 5.2 :** On or before the signature by NICKEL of the present Agreement,
279  IMS shall cause its attorneys to prepare and deliver to NICKEL an opinion letter, which
280  letter shall opine that in such attorney's opinion, the Warrants set forth at Exhibit "C"
281  hereof and intended to be delivered in full satisfaction of the obligation set forth at
282  Section 5.1 hereof, are in every respect sufficient to satisfy the exigencies set forth in
283  this Agreement for same, and IMS agrees that in the event, that for any reason

                                    UMBRELLA AGREEMENT
                          INNOVATIVE MEDICAL SERVICES "IMS"
                                    NICKEL LTD "NICKEL"
                    FINAL X In Two Duplicate Originals Intended for signature

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

284  whatsoever, the Warrants are at any time, notwithstanding counsel's opinion,
285  determined to be inconsistent and/or non-conforming with the provision of Section 5.1,
286  that it will undertake at its own expense, to ensure that the Warrants are rendered
287  consistent and conforming in every respect.

288      **Section 5.3** : The provision set forth at 5.1 hereinabove is a material condition
289  of this Agreement without which NICKEL would not have contracted.

290      **Section 5.4:** Delivery of The Warrants in satisfaction herein, shall not be
291  deemed complete or in satisfaction of the provision herein, until such warrants are duly
292  accepted and entered for credit as a tradeable security to NICKEL and/or its
293  designee(s) in an account established for the purpose on the books and records of a
294  licensed US stock brokerage firm. IMS will undertake all necessary administrative and
295  other actions to enable this provision.

296      **Section 5.5** : The Warrants shall fully and unconditionally vest in NICKEL and
297  / or its designee(s) on the opening day of the Euro PROPRE Trade Show on March
298  11,2003 at the Porte de Versailles in Paris France, providing that NICKEL shall, on its
299  stand, then feature and present finished or prototype versions of an initial line of varied
300  surface disinfectants intended to or containing Axen under its Bac'Out® brand. IMS
301  shall dispatch to the stand, and for the duration of the show, a competent technical
302  person able to fully explain and present the Axen technology in support of NICKEL's
303  presentation of its line of Bac'Out® products.

304      **Section 5.6** : Immediately following completion of the Euro PROPRE Trade
305  Show or as soon as practicable thereafter, NICKEL will, if it hasn't already done so, (a)
306  cause manufacturing productions to initiate for its initial line of Bac'Out® products, (b)
307  cause information brochures to be circulated to and about its distribution network and

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

308  (c) generally offer and promote, consistent with the provisions of this Agreement, its
309  Bac'Out® line of varied products for sale.

310        **Section 5.7** : Simultaneously with the execution hereof, NICKEL has placed and
311  IMS has accepted an initial order for immediate delivery of 30 barrels of 200 L of Axen
312  30 PPM at a price of $ 820,00 per barrel. IMS acknowledges that its inability to deliver,
313  or a delayed delivery of such product on or before January 31 will delay production and
314  sales, and that such a consequence is entirely beyond NICKEL's control. NICKEL
315  expects to make another similar order within 30 days thereafter to ensure a second
316  wave of production for promotional launch sales, and anticipates that subsequent
317  orders will be made in aggregates of one full 20' container (approximately 50-60
318  barrels). IMS represents that it has the capacity to ensure and provide a reliable supply
319  of Axen 30 PPM solution.

320        **Section 5.8** : For the purpose of this Agreement and for any related accounting
321  purpose now or in the future, the Parties have agreed as appropriate and accurate, an
322  equal allocation of value as and amongst the three sets of  rights acquired by IMS,
323  those acquired under this Agreement and those acquired under the two Super
324  Distribution Agreements (Exhibit "A" and "B").

325        BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

326                                 VI
327                   GRANT TO NEWCO OF SUPER
328         DISTRIBUTION ON CLEAN PLUS® LINE OF PRODUCTS
329                       _____

330      GRANT TO IMS OF SUPER DISTRIBUTION ON CLEAN PLUS® LINE OF
331                            PRODUCTS

332      **Section 6.1:** NICKEL, will simultaneously with the signature of the present
333  Agreement and by separate Agreement,

334           (a) grant to NEWCO, all of the rights, privileges and opportunities of a
335  Super Distributor for Clean Plus® Consumer and Industrial Products as and for the
336  Automotive After-Care Market Segment in the Activity Sector known as Key Retail
337  Accounts, all as more particularly defined and set forth in the Super Distribution
338  Agreement set forth at Exhibit "A" hereof.

339           (b) grant to IMS, all of the rights, privileges and opportunities of a Super
340  Distributor for Clean Plus® Industrial Products as and for the Cleaning Industry Market
341  Segment in the Activity Sector known as Key Suppliers to Sanitation and Janitorial
342  Tradesmen, all as more particularly defined and set forth in the Super Distribution
343  Agreement set forth at Exhibit "B" hereof.

344           (c) The Super Distribution Agreements, include the forthcoming product
345  group Bac'OUT®.

                                            UMBRELLA AGREEMENT
                          INNOVATIVE MEDICAL SERVICES "IMS"
                                            NICKEL LTD "NICKEL"
                  FINAL X In Two Duplicate Originals Intended for signature

18

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

346                                    VII
347                          LICENSE TO NICKEL
348        FOR AXEN PRODUCT IN DISINFECTANT AND CLEANSING PRODUCTS
349           UNCONDITIONAL EXCLUSIVITY IN RESPECT TO WET WIPES·

350        **Section 7.1** : IMS is the proprietor of a patent, and controls and exploits a
351   disinfectant and technology enabling the manufacture of a disinfectant concentrate
352   known as AXENOHL which particular concentrate is not offered for sale nor will be
353   sold. AXEN is a dilution of the AXENOHL concentrate which may and will be provided
354·  in any concentration solicited, not in excess of 1000 PPM, for any reasonable use,
355  .consistent with the concentration's intended purpose, in a final product. Only the AXEN
356   product is concerned by this licence and provision.

357        **Section 7.2** : IMS grants to NICKEL, its successors and assigns, and shall
358   subsequently, upon request, execute and deliver, to NICKEL, any and all further
359   instruments, and will do any and all further acts necessary or desired by NICKEL fully
360   to vest and confirm the same to NICKEL, its successors and assigns, (a) a license in
361   Europe and in all European possessions and territories (the term "Europe" is and
362   includes all present countries or derivatives thereof as may in the future result, and is
363   as herein defined at Exhibit "D"), for disinfectant, sanitation and cleansing products
364   containing Axen and (b) an unqualified exclusivity for Europe and all European
365   possessions and territories; the United States, Mexico and Canada for the use,
366   development and sale of the Axen product in and for incorporation in wet wipes of every
367   kind and nature. Further, in order to minimize shipping costs, IMS agrees at and upon
368   request from NICKEL, to assist it in the blending process by providing all necessary
369   training and assistance to enable NICKEL to blend Axen from higher to lower
370   concentrations of·use dilution.

                                              UMBRELLA AGREEMENT
                             INNOVATIVE MEDICAL SERVICES "IMS"
                                                NICKEL LTD "NICKEL"
                        FINAL X In Two·Duplicate Originals Intended for signature

+ within the scope of the Axen license agreement attached hereto as Exhibit "E"
                                                                                       19

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

371     **Section 7.3 :** IMS shall be free to directly solicit and operate Axen sales in the
372 countries and possessions and territories specified in Exhibit "D" providing that it shall
373 in all respect conform its activity to the following conditions : (a) All of such sales shall
374 be made in cooperation with and on prior notice to NICKEL, (b) IMS shall operate a
375 pricing policy that shall not enable a sale to a customer for a price that shall be lesser
376 than 117,6% of NICKEL's current or next available purchase price from IMS (15%
377 margin) and (c) IMS shall not enable a sale to any party who, ~~directly or indirectly~~, is
378 in the business of, or whose business includes any wet wipes, ~~and/or who refuses to~~
379 ~~provide a written guaranty as a condition of sale, that the Axen product will not be used,~~
380 ~~or sold to any party for use, incorporation or exploitation in or in conjunction with a wet~~
381 ~~wipe.~~ As and with the issuance of any invoice for the sale anywhere of any product
382 finding its way into the countries and possessions and territories specified in Exhibit "D"
383 as a result of IMS sales to its direct or indirect customers, remit to NICKEL, a report of
384 sale and payment of the  sum of 15% of the sales price invoiced. The amount of the
385 commission will be computed and paid quarterly based on IMS' fiscal year.
386 Disbursement to be made to NICKEL within 10 days of the filing of IMS' quarterly period
387 end.

388     **Section 7.4:** IMS shall keep true and accurate books of account in which shall
389 be entered each sale operated by it in respect to the provisions set forth at Section 7.3
390 hereof, and such appropriate books of account, during all business hours, shall be
391 open to the examination and inspection of NICKEL, or its duly authorized attorney or
392 accountant.
393
394     **Section 7.5 :** IMS shall render and deliver to NICKEL 30 days after IMS' filing
395 of its fiscal year end, a full and accurate statement, in writing, of all sales operated
396 and/or invoiced by it in the countries, possessions and territories specified in Exhibit
397 "D" hereof during the preceding year, and simultaneously with the rendition and

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

20

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

398  delivery of such statement, IMS shall pay to NICKEL any unpaid amounts due upon

399  analysis and deduction of amounts prior paid during the course of the preceding year,

400  as and for the reported transactions.


401      **Section 7.6**: NICKEL, in consideration of this Agreement, and provided that

402  IMS shall faithfully keep, observe and perform all covenants and agreements

403  contained therein, shall with the scientific patronage of IMS made available at

404  NICKEL's every request, (a) immediately ensûre an aggressive finished product

405  development program under its label Bac'OUT® which line of disinfectant products

406  will to the maximum extent possible incorporate the Axen (Axenohl) solution[3], and


[3] In initiating its current efforts and processes for regulatory certifications, NICKEL
has relied on the information provided by IMS in fashioning the following product
development plan for its Bac'OUT® group of products : The Bac'OUT® group in its
strategic plan, is an eco-degradeable / least-toxic / Extra strenght line of products with
Stabilized ionic Silver, anti-microbial 30ppm strenght formula - Extra Strenght
disinfectant products for Hospitals, Institutions, Food preparation, restaurants, hotels,
hospitality. Its target convenience will be a full line of disinfectant wipes in buckets and
tubs, plus a range of Spray and liquids. The efficacy to be promoted is that stabilized
ionic silver provides a broad spectrum of effectiveness, high kill activity as to certain
bacteria, viral and fungal organisms found on hard surfaces in health related
environments, and up to 24 hour protection against bacteria. The benefits targeted with
the Bac'OUT® line over the standard alcohol, chlorine, peroxygens, iodine, phenols
and quarternaries who all have their benefits - are that Bac'OUT® thanks to Axen, has
ALL of the benefits : Non-flamable, non-corrosive, non-irritating fumes, no skin irritation,
stable in solution, category IV toxicity, plus significant residual activity, up to 24 hours.
The uniqueness of the Bac'OUT® product group and notably the wet wipe products, will
lie in its unique relationship with Axen, and uniqueness in the market with a product
reliant on stabilized ionic silver. SIC is an Ag+ (silver ion) based formula. Silver ions
have long been known for their ability to destroy bacteria, fungus and viruses. Prior to
SIC products containing Ag+ tested poorly with relatively short shelf life and exhibited
rapid reuction of ionic concentratio. The ionic size and charge associated with the Ag+

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

21

06/10 '03 11:29  TEL 003     422316          NICKEL FINANCE                    Ø14

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

407  (b) cause the trademark AXEN® to be registered in its name, in the European
408  Community, in order to permit the promotion of the brand, and notably as a name
409  component on Bac'OUT® labels and documentation IMS herein grants to NICKEL   ok
410  the unqualified right to the use of the name or trademark Axen or Axenohl in all of its
411  labelling, documentation and commercial efforts and notably in respect to
412  Bac'OUT® wherever sold. NICKEL will also, both in cooperation with IMS and
413  independently, lend its best effort to the commercialization within the territory
414  defined at Exhibit "D", of the Axen product as a raw material to qualified non-
415  excluded manufacturers and converters.

416       **Section 7.7** : IMS shall, with reasonable dispatch and priority, fill any and all
417  orders that it may receive from NICKEL, its subsidiaries or associate companies and
418  customers  for the Axen product.

419       **Section 7.8** : IMS warrants that all Axen raw product delivered to NICKEL or
420  its customers shall be free from defects in material and workmanship and consistent
421  with its documentory and technical representations.

422       **Section 7.9** : IMS will furnish NICKEL, from time to time, with a reasonable
423  number of its current printed materials, catalogues and other advertising matter
424  designed for display or mailing in English.

425       **Section 7.10:** In the event of any application to IMS by a third party for a
426  licence coupled or not to exclusivity for the development of a new and different
427  application containing Axen, NICKEL shall have an unqualified right of first refusal

process in SIC is coupled with the stabilizing effect of an organic acid, allowing the
ionic silver to remain in solution without precipitating.  with minimal precipitation.

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

22

06/10 '03 11:29  TEL 005   422316        NICKEL FINANCE                    ☑15

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

428  to such licence and exclusivity. In the event of NICKEL'S election to exercise such
429  right, NICKEL agrees to meet  the bonafide 3rd party's offer for the grant of
430  exclusivity for the development and commercialization of said new and different
431  product or application, such acceptance to be noticed to IMS within 40 days of
432  acknowledged notice to NICKEL of the bonafide proposition. Nothing herein
433· contained or contemplated shall in any event affect, limit or otherwise restrict any of
434  the rights of NICKEL as consented to it hereunder.

435      **Section 7.11** : In consideration of the foregoing, NICKEL will diligently process
436  all  necessary  regulatory  and  other  approvals  required  as  a  condition  to  the
437. commercialization of its Axen based Bac'OUT® products in and about its European
438  distribution network, and commencing nine months from the date at which it may legally
439  offer such line of products for sale, NICKEL agrees that it will purchase not less than
440  $ 4,800.00 of Axen product every calendar quarter.

441      **Section 7.12** : Annexed hereto at Exhibit "E" is a copy of IMS' usual form of
442  license agreement. Only to the extent that the same is not inconsistent with the
443  provisions of Article VII herein, such as are usual standard conditions and terms are
444  incorporated herein by reference.

445                              VIII
446                      BUY-SELL PROVISION
447          AS AND BETWEEN NICKEL AND IMS IN RESPECT TO NEWCO

448      **Section 8.1:** The parties, desiring to restrict the transfer of NEWCO's shares of
449  common stock, provide, and agree as follows.

450      **Section 8.2:** No portion, of any parties' equity interest in the shares of common

                              UMBRELLA AGREEMENT
                      INNOVATIVE MEDICAL SERVICES "IMS"
                              NICKEL LTD "NICKEL"
              FINAL X In Two Duplicate Originals Intended for signature

                                                                23

06/10 '03 11:29 TEL 003 422316          NICKEL FINANCE                    @16

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

451 stock of NEWCO shall be sold, transferred or alienated in any manner whatever, unless
452 there shall have first been communicated notice as provided for herein, of an offer to
453 the other shareholder for the purchase of same, upon the terms and conditions set forth
454 below.

455      **Section 8.3:** The stockholder desiring to sell all or part of his capital stock
456 (equity interest) in NEWCO, shall notify the other stockholder by certified or registered
457 mail, return receipt requested, that he has a bona fide offer for the sale of its
458 shares/common stock. The notice shall state the name and address of the person or
459 entity making the offer, the number of shares to be sold, and the sales price and terms
460 of payment. The notice shall contain an offer to sell the stock to the other stockholder.
461 The offer shall be for the same price and upon the same terms of payment as those set
462 forth in the bona fide offer.

463      **Section 8.4:** The stockholder to whom the notice is addressed shall have the
464 right to accept the offer to sell the offering stockholder's stock within 90 days from the
465 date that the notice and offer was received. The offer may be accepted only by certified
466 or registered mail, return receipt requested, addressed to the stockholder desiring to
467 sell the stock. The acceptance shall be effective upon mailing.

                                    *receipt of*

468      **Section 8.5:** If such shareholder fails to accept the offer within 90 days after
469 notice of the offer is received, or if the stockholder notifies the offering stockholder that
470 it consent to the sale, or will not accept the offer, the offering stockholder may sell his
471 stock (equity interest) only to the person or entity named in the notice at the price and
472 upon the terms of payment set out in the notice. However, the sale must be completed
473 within 120 days following the date the notice was mailed.

474      **Section 8.6:** The following legend shall be placed on NEWCO(s) certificate of
475 stock, immediately following the execution this agreement;

                              UMBRELLA AGREEMENT
                        INNOVATIVE MEDICAL SERVICES "IMS"
                              NICKEL LTD "NICKEL"
              FINAL X In Two Duplicate Originals Intended for signature

24

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

476       "TAKE NOTICE, that the sale, assignment, transfer or pledge of shares
477       represented by this certificate are subject to the restrictions contained in
478       an Agreement dated the        day of            2003, a copy of which
479       is on file at the corporation's office."

480       **Section 8.7:** The foregoing notwithstanding, the restrictions set forth above shall
481   terminate upon the occurrence of any of the following events; i). a voluntary or
482   involuntary termination of NEWCO(s) business, ii) by written agreement of all of the
483   stockholders, iii) upon the sale, assignment, transfer or pledge of any stockholders
484   shares in accordance with this Agreement, or iv) upon adjudication bankruptcy or
485   insolvency of any stockholder, appointment of a receiver of the assets of any
486   stockholder, unless the appointment is vacated within 90 days after it becomes
487   effective.

488                                         IX
489                       UNDERTAKING OF THE PARTIES
490       TO ENSURE A U.S. BASED REVOLVING LINE OF CREDIT OR FACTORING
491                              FACILITY FOR NEWCO.

492       **Section 9.1 :** NEWCO in keeping with its ratified mandate to exploit and
493   maximize the benefits of its Super Distribution Agreement, is to  use its best efforts and
494   facilities to establish, maintain and increase the sales of Clean Plus® and all other
495   products manufactured and sold by NICKEL as provided for in the Super Distribution
496   Agreement (Exhibit "A") and to bring such goods to the continuous attention of the
497   public and professional trades as the case may require under the Agreement and give
498   NICKEL's products first preference in display, advertising and sale, wherever the
499   opportunity ;

                                            UMBRELLA AGREEMENT
                          INNOVATIVE MEDICAL SERVICES "IMS"
                                     NICKEL LTD "NICKEL"
                 FINAL X In Two Duplicate Originals Intended for signature



25

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

500        **Section 9.2 :** NEWCO's efforts are to be directed to the Market Segment known
501   as the automotive after-market in the US, and in the Activity Sector consisting of Key
502   Retail Accounts, all as more particularly defined and provided for in the Super
503   Distribution Agreement set forth at Exhibit "A" hereof.

504        **Section 9.3 :** In order to enable NEWCO to operate in this environment and
505   ensure its ability to meet deliveries generated as a consequence of sales, the Parties
506   recognize the imperative of NEWCO's ability to finance receivables to Key Retail
507   Account. Consequently, NEWCO will, relying primarily upon the managerial
508   competence provided by IMS, immediately endeavor to negotiate and obtain a
509   revolving line of credit or so-called factoring line which will advance cash funds on
510   presentation of Key Retail Account invoices representing *bona fide* sale to any such
511   Key Retail Account.

512        **Section 9.4 :** The parties will vote their respective interests in NEWCO and cast
513   their votes as directors of NEWCO to ensure management's full authority to negotiate
514   and obtain such credit facility, and to ensure the adoption and ratification by NEWCO
515   of the terms and conditions of such credit offering consistent with the foregoing, but
516   provided however, that management authority shall be limited, such that it shall not
517   make use of such facility except such as to ensure that each and every such drawdown
518   or invoice financing advance, shall be transaction specific and expressly restricted in
519   respect to the use of proceeds such that (a) all proceeds of any such invoice financing
520   advances are firstly and immediately paid out (a) in satisfaction of the entire amount of
521   the unpaid invoice from NICKEL which relates to the goods sold in the factored invoice,
522   and (b) any interest or principal adjustment due the creditor on the revolving facility
523   and mandated by its terms. Providing however, (c) that the aggregate balance of any
524   such financing whatever its character shall not exceed 80% of all outstanding
525   receivables within their due date, and (d) that shall be invoiced by NEWCO to NICKEL,

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

26

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

526  such amount of interest as shall accrue at the expense of NEWCO from the date of the
527  advance and payment to NICKEL, and for such amount paid to it, to and including the
528  due date provided for by the invoice, were it to have been paid according to its terms[4].

529                                          X
530                              GENERAL PROVISIONS

531        **Section 10.1:** Every notice required or contemplated by this Agreement, by any
532  party, may be delivered in person or given by postage prepaid registered mail return
533  receipt requested (or it's equivalent under the laws of the country where mailed), which
534  shall be registered air mail if posted in a country other than that of the addressee,
535  addressed to the party for whom intended, at the address specified at the beginning of
536  this Agreement for each and every party, or at such other address as the intended
537  recipient previously shall have designated by written notice to the other party(ies).
538  Unless otherwise provided in this Agreement, notice by registered mail return receipt
539  requested, shall be effective on the date it is officially recorded as delivered by return
540  receipt or equivalent, and in the absence of such record of delivery, it shall be
541  presumed to have been delivered on the thirtieth (30th) day, or the next day thereafter,

---

[4] Hence, a sale to Walmart invoiced on June 1, financed on June 5th, as to which
the financed proceeds must be used (a) to pay the corresponding invoice to NICKEL
which invoice is presumably dated before the sale date to Walmart, ie May 15 with a
due date of July 23 would result in NEWCO billing NICKEL for all interest accrued on
that portion paid to it of the drawdown on the revolving or factoring line from the date
of the drawdown / payment ie June 5th up to and including July 23. Consequently, and
it is the intent of this provision, the financing of the purchase of goods acquired for sale
from NICKEL produces no expenditure for that portion of the revolving or factoring debt
of NEWCO and is therefore a permitted transaction under the provisions of Section
1.11 and 3.2 and others set forth hereunder.

                                    UMBRELLA AGREEMENT
                            INNOVATIVE MEDICAL SERVICES "IMS"
                                      NICKEL LTD "NICKEL"
                    FINAL X In Two Duplicate Originals Intended for signature

                                                                          27

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

542  after it was deposited in the mail. Notice not given in writing shall be effective only if
543  acknowledged in writing by the party to whom it was given.

544       **Section 10.2:** The failure of any party hereto, at anytime, to require performance
545  by the other(s) of any provision of this Agreement shall in no way affect the right of
546  such party to require performance of that or any provision, and any waiver by any party
547  of any breach of any provision of this Agreement shall not be construed as a waiver of
548  any continuing or succeeding breach of such provision, a waiver of the provision itself,
549  or a waiver of any right under this Agreement.

550       **Section 10.3:** This document and its included scheduled exhibits sets forth the
551  entire Agreement and understanding between the parties relating to the subject
552  matter(s) contained therein and merges and supersedes all prior discussions and
553  documents relating thereto, and no Party shall be bound by any definition, condition,
554  representation, warranty, promise or provision other than as expressly set forth in this
555  Agreement, or as is contemporaneously or subsequently set forth in writing and
556  executed by the party(ies) to be bound thereby. The failure or refusal of any party to
557  inspect the Agreement or other documents, or the failure to obtain legal or other advise
558  relevant to this transaction, constitutes an irrevocable waiver of any objection,
559  contention or claim that might have been based on such reading, inspection or advise.
560  No modification or amendment of this Agreement shall be of any force or effect unless
561  in writing and executed by all of the Parties to be charged thereunder.

562       **Section 10.4:** The validity, construction and enforceability of this Agreement
563  shall be governed in all respects by application of the substantive law of contracts as
564  practiced in the State of New Jersey, United States of America, but the choice of law
565  or procedural provisions of any such law shall not be applicable.

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

28

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

566      **Section 10.5:** All of the Parties agree, that the official and only binding and
567  effective text of this Agreement exist only in the English language as construed under
568  an American literary use and in its technical terminology. Both of the Parties
569  acknowledge all necessary access to solicit and obtain whatever professional
570  assistance, necessary for their proper and competent evaluation and understanding of
571  the consequences to arise out of the obligations and promises consented under this
572  Agreement. Any translated version of this Agreement is to be deemed and considered
573  only for informational purposes, and no Party shall be entitled to rely upon the text of
574  a translated version when asserting any right, when attempting to enforce the
575  performance of any obligation, or for any other purpose at all.

576      **Section 10.6:** Descriptive headings, the index and the table of contents if any,
577  wherever located or at any time generated are for convenience only and shall not
578  control or affect the meaning or construction of any provision of this Agreement.

579      **Section 10.7:** In case one or more provisions contained in this Agreement shall
580  for any reason be held to be invalid, illegal or unenforceable in any respect, such
581  invalidity, illegality or unenforceability shall not affect any other provision hereof, and
582  this Agreement shall be construed as if such invalid, illegal or unenforceable provision
583  had never been contained herein,.

584      **Section 10.8:** All of the Parties represent that the signatures set forth herein are
585  that of the proper individuals, or in the case of corporations or other entities, that of the
586  proper officers, partners, or Parties authorized in every respect to bind the Party or
587  executing entity.

588      **Section 10.9:** All of the Parties represent that there are no legal actions, suits
589  or other legal or administrative proceedings, pending or threatened against any of the

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

29

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

590  parties which might in any manner affect the Parties ability to properly perform hereun-
591  der, and the Parties are unaware of any facts that might result in any such action(s),
592  suit(s) or proceeding(s).

593      **Section 10.10:** No action, regardless of form, arising out of this Agreement, may
594  be brought by any party hereto, more than two (2) years after the cause of action has
595  arisen.

596      **Section 10.11:** This Agreement and all of the rights contained thereunder, may
597  not be assigned by either Party without the express consent of the other, but the Super
598  Distribution Agreements set forth at Exhibits "A" and "B" shall provide that while they
599  are similarly not assigneable without the express consent of NICKEL, that such consent
600  shall not be unreasonably witheld in respect of an assignee presenting substantially
601  equal or improved credentials and economic assurances as NEWCO and IMS as at the
602  time of this Agreement.

603      **Section 10.12:** This Agreement shall be binding upon and inure to the benefit
604  of the Parties hereto, their successors and assigns.

605      **Section 10.13:** This Agreement may be executed in any number of counterparts
606  or may be, where the same are not required, certified or otherwise delivered without the
607  testimonium clause and signatures; each such counterpart hereof shall be deemed to
608  be an original instrument, but all such counterparts together shall constitute but one
609  agreement.

610      **Section 10.14:** Should any sales tax become payable to a United States'
611  jurisdiction at or subsequent to the execution of this Agreement in connection with the
612  transfers or rights established, such tax or other impound shall be paid by IMS, and IMS

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature



30

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

613  solely undertakes to pay the same and indemnify and hold NICKEL harmless from any
614  and all liability in connection therewith.

615       **Section 10.15:** All Parties to this Agreement respectively agree that they will
616  execute any and all required and/or necessary documents to accomplish and fully
617  perform all of the provisions of this Agreement, including, but not limited to any
618  documentation necessary to perfect the interests of the Parties hereunder.

619       **Section 10.16:** IMS has no information or knowledge of any change
620  contemplated in any applicable laws, ordinances, restrictions or any judicial
621  administrative action, or any action by competitors which would prevent, limit, impede
622  or render more costly the contemplated use of the Axen properties.

623       **Section 10.17:** Each of the parties has complied with all of applicable laws,
624  ordinances, regulations, statutes, rules and restrictions to which it is subjected in
625  respect to its activity, and pertaining to and affecting its intended and required
626  performance(s) hereunder. Performance of this Agreement will not result in any breach
627  of, or constitute any default under, or result in the imposition of, any lien or
628  encumbrance upon the property of the either Party under any agreement or other
629  instrument to which such Party might be bound.

630   ..   **Section 10.18:** In the event of a willful default by either Party, each, subject to
631  the provisions of this Agreement, shall have such remedies as to which it may be
632  entitled to at law or in equity, including to the assertion of Special Proceedings and to
633  a plea for Exceptional Remedies. In the event of a willful default by IMS, NICKEL's
634  remedies shall include that of specific performance  because the Axen product is
635  unique, not suceptible of duplication, and its loss to NICKEL would be difficult to
636  compensate by a money award.

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

31

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

637        **Section 10.19:** In the event that notwithstanding the provisions hereof, IMS shall
638  in relation to any disagreement arising out of this Agreement, attempt or actually
639  institute any legal or other proceeding in connection with or for the enforcement of this
640  Agreement, in a United States jurisdiction, then in that event IMS specifically agrees
641  that for all relevant purposes herein (a) the U.S. court is without subject matter
642  jurisdiction and does not have personal jurisdiction over NICKEL or any of its
643  representatives, officers, agents or other persons susceptible of representing it, and (b)
644  that NICKEL shall be entitled to be refunded by IMS for all costs of suit, including
645  attorney fees, investigators, and all related and administrative expense, at both the trial
646  and appellate levels in the defence of any such US based suit, action, or proceeding,
647  and (c) that NICKEL shall have no obligation to make an appearance whether general
648  or special - even one limited to a defense on the jurisdictional basis of incompetence
649  or absence of personal jurisdiction - in the action or proceeding instituted and IMS
650  agrees to disavow any right to assert the validity or enforceability of any judgment
651  rendered thereunder.

652        **Section 10.20:** In the event that notwithstanding the provisions hereof,
653  NICKEL shall in relation to any disagreement arising out of this specific Agreement,
654  attempt or actually institute any legal or other proceeding in connection with or for the
655  enforcement of this Agreement, in a French jurisdiction, then in that event NICKEL
656  specifically agrees that for all relevant purposes herein (a) the French court is without
657  subject matter jurisdiction and does not have personal jurisdiction over IMS or any of
658  its representatives, officers, agents or other persons susceptible of representing it, and
659  (b) that IMS shall be entitled to be refunded by NICKEL for all costs of suit, including
660  attorney fees, investigators, and all related and administrative expense, at both the trial
661  and appellate levels in the defence of any such French based suit, action, or
662  proceeding, and (c) that IMS shall have no obligation to make an appearance whether
663  general or special - even one limited to a defense on the jurisdictional basis of

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

32

06/10 '03 11:29  TEL 003    422316        NICKEL FINANCE                    ☒25

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

4 incompetence or absence of personal jurisdiction - in the action or proceeding instituted
5 and NICKEL agrees to disavow any right to assert the validity or enforceability of any
6 judgment rendered thereunder.


7      **Section 10.21:**  Any disagreement arising out of this Agreement whether
8 sounding in tort or in contract, shall be submitted to binding arbitration conducted in the
9 English language to be held in Stockholm, Sweden, under the International Arbitration
0 Rules (effective November 1, 2001) of the American Arbitration Association
1 [www.adr.org]. Judgment upon the award may be entered in any court having
2 jurisdiction under this Agreement with no appeal therefrom.  The arbitrators shall have
3 no power to change any of the provisions of this Agreement in any respect, nor, shall
4 they have the power to make an award of reformation, or, to formulate any relief for any
5 Party on the basis of any finding of adhesion, duress, undue influence, or other similar
6 suggestion that any one of the Parties had executed this Agreement in any state of
7 mind other than one willing, able, knowing, informed and desirous of entering into this
8 Agreement, and the jurisdiction of the arbitrators is hereby expressly limited
9 accordingly. The arbitration shall be by a panel of three arbitrators, one of whom must
0 be an attorney at law actively engaged in the practice of his or her profession, and
1 specialized in the area of contract law, for at least ten years.  The procedures to be
2 invoked under this provision shall be as follows:
3      i) Any Party may request arbitration of any matter in dispute. The Party
4 requesting arbitration shall do so by giving notice to the other Party, specifying in the
5 notice the name and address of a disinterested person designated to act as an
6 arbitrator on its behalf. Within 30 days after the service of such notice, the other Party
7 shall give notice to the first Party specifying the name and address of a disinterested
8 person designated to act as an arbitrator on its behalf. If the second Party fails to notify
9 the first Party of the appointment of its arbitrator within the time above specified, then
0 the appointment of the second arbitrator shall be made in the same manner as

                        UMBRELLA AGREEMENT
               INNOVATIVE MEDICAL SERVICES "IMS"
                        NICKEL LTD "NICKEL"
          FINAL X In Two Duplicate Originals Intended for signature

                                                              33

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...:

91  hereinafter provided for the appointment of a third arbitrator, in a case where the two
92  arbitrators appointed and the Parties are unable to agree on such appointment, the two
93  arbitrators so chosen shall meet within 10 days after the second arbitrator is appointed,
94  and they shall together appoint a disinterested person as a third arbitrator. If they are
95  unable to agree upon such appointment within 30 days after the appointment of the
96  second arbitrator, the third arbitrator shall be selected by the Parties themselves if they
97  can so agree within a further 10 days. If the Parties do not so agree, then any Party,
98  on behalf of and on notice to the other(s), may request such appointment by the
99  American Arbitration Association (or any organization successor thereto) in accordance
00  with its rules then prevailing or if the American Arbitration Association (or such succes-
01  sor organization) shall fail to appoint said third arbitrator within 30 days after such
02  request is made, then any Party may apply, on notice to the other, to the appropriate
03  court of the Kingdom of Sweden for the appointment of such third arbitrator. Each
04  arbitrator chosen or appointed pursuant to this Section shall have at least ten years
05  experience in a calling connected to the subject matter of the dispute, and the third
06  arbitrator shall also be a disinterested person.
07          ii. The arbitration shall be conducted, to the extent consistent with this provision,
08  in accordance with the then prevailing rules of Arbitration in Stockholm, Sweden. The
09  arbitrators shall have the right to retain and consult experts and competent authorities
10  skilled in the matter(s) under arbitration but any such consultation shall be made in the
11  presence of both Parties with full right on their part to cross examine such experts and
12  authorities. The arbitrators shall render their award, upon the concurrence of at least
13  two of their number, not later than 90 days after the appointment of the third arbitrator.
14  Their decision and award shall be in writing and counterpart copies shall be delivered
15  to each of the Parties. In rendering their award, the jurisdiction of the arbitrators shall
16  be limited in accord with the provisions set forth above. Judgment may be entered on
17  the award of the arbitrators so rendered.
718         iii. Each of the participating Parties shall pay the fees and expenses of the one

UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature



34

06/10 '03 11:29 TEL 003   422316         NICKEL FINANCE                                     27

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services Inc (IMS)...

719  of the two original arbitrators appointed by or for such Party, and the fees and
720  expenses of the third arbitrator and all other expenses of the arbitration shall be borne
721  by the Parties equally. Each of the participating Parties shall bear the expense of its
722  own counsel, experts and preparation and presentation of proof.
723

724       **Section 10.22:** Where, in any circumstance under this Agreement, the
725  occurrence of an event, or the giving of notice, must take place before arbitration may
726  be invoked, then the occurrence of that event or the giving of that notice (and if the
727  notice be given, that it have been so given, in a timely and proper manner) are hereby
728  in each instance expressly made a condition to invoking arbitration. The jurisdiction of
729  the arbitrators is hereby expressly further limited accordingly.

730       **Section 10.23:** No party shall be entitled to interrupt the progress of it's
731  respective area of performance under this Agreement pending the determination in an
732  arbitration proceeding.

733       IN AGREEMENT WHEREOF, each of the parties has on this 13rd day of January
734.        2003, caused his/her/it's respective signature and seal to be duly applied
735  hereunder, acknowledging each and every one of it's 36 pages.

736            BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK

                                              UMBRELLA AGREEMENT
                                    INNOVATIVE MEDICAL SERVICES "IMS"
                                                  NICKEL LTD "NICKEL"
                        FINAL X In-Two Duplicate Originals Intended for signature

                                                                          35

Contract UMBRELLA AGREEMENT, Nickel Ltd (NICKEL) / Innovative Medical Services
Inc (IMS)...

737   IN PARIS, FRANCE
738      This *h Hh* day of *July* 2003

739                     NICKEL LTD

*As Amended by with s.I.I (Jan 13, 2003, and forth here of Exhibit "f"*

740              BY : _____
741                     Helle MADSØ
742                     Vice President   *VICE PRESIDENT*

743   IN EL CAJON CALIFORNIA 92020 USA
744      This *15* day of *July* 2003

745             INNOVATIVE MEDICAL SERVICES INC

746              BY: _____
747                    Michael L. KRALL
748             President and Chief Executive Officer

*As amended by Emile Geniran letter dated January 13, 2003*
*appended hereto as Exhibit "f".*

                                                     UMBRELLA AGREEMENT
INNOVATIVE MEDICAL SERVICES "IMS"
NICKEL LTD "NICKEL"
FINAL X In Two Duplicate Originals Intended for signature

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Nickel Ltd.
Falken Industries, Ltd.   State of New Jersey

**DEFENDANTS**

Pure Bio   '04 NOV -9 PM 3:48   BEN (RBB)

'04 CV 2248

**FILED**

SOUTHERN DISTRICT OF CALIFORNIA
BY:   DEPUTY

San Diego County

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Joel S. Seidel
10325 Alder Avenue
Granada Hills, CA 91344
tel: 818/832-7850; fax: 818/832-7889

**ATTORNEYS (IF KNOWN)**

Wolfgang Hahn
7160 Corminito Pepino
La Jolla, CA 92037
tel: 858/535-1000; fax: 858/456-5080

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff    ☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)**
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)**

28:1332 OG OP. Complaint for declaratory judgment under 28 USC § 2201 that plaintiffs are not subject of arbitration in California; diversity jurisdiction under 28 USC § 1332

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 490 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Label & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (13958) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $ Declaratory Judgment

Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE          Docket Number

DATE 11/2/04          SIGNATURE OF ATTORNEY OF RECORD

#/08881   $150.00

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)