USDC SCAN INDEX SHEET

















```
RYC    9/30/05    16:15
3:04-CV-02248   NICKEL LTD V. PURE BIOSCIENCE
*17*
*O.*
```

FILED

05 SEP 30 PM 3: 17

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

NICKEL, LTD. and FALKEN INDUSTRIES, LTD.,

    Petitioners,

v.

Pure Bioscience BIOSCIENCE fka Innovative Medical Services,

    Respondent.

Civil No. 04-CV-2248-L(NLS)

**ORDER GRANTING PETITION FOR ORDER COMPELLING NICKEL TO ARBITRATION**
[doc. #1]

    Respondent Pure Bioscience Bioscience fka Innovative Medical Services, Inc. ("Pure Bioscience") filed a petition for order compelling Nickel, Ltd. ("Nickel") to arbitration. Wolfgang P. Hahn, Esq. and Charles E. Brumfield, Esq. appeared for Pure Bioscience Bioscience, and Joel S. Seidel, Esq. appeared for Nickel. The petition has been fully briefed and the Court considers the petition suitable for determination on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d)(1). Having fully reviewed the matter presented, the Court enters the following decision.

**Background**

    **1.**    **Prior Litigation Between the Parties**

    The present action follows an earlier case, *Pure Bioscience Bioscience fka Innovative Medical Services, Inc. v. Falken Industries, Ltd.*, 04-CV-1147-L(NLS), wherein Pure Bioscience

moved to compel arbitration and Falken moved to dismiss the petition for lack of personal jurisdiction. By Order filed January 4, 2005, the Court granted Pure Bioscience's petition to compel arbitration by finding that Falken was equitably estopped from avoiding arbitration and denied Falken's motion to dismiss for personal jurisdiction.

The factual background set forth in the earlier action is relevant in part to the current petition to compel Nickel to arbitration and will be repeated here.[1]

On November 15, 2001, Pure Bioscience and a non-party to this litigation, NVID International, *inter alia*, entered into a Core Settlement Agreement as a global resolution of various disputes between the parties in several litigation and arbitration matters. As part of the Core Settlement Agreement, the parties executed an "Assignment of Patent and Related Intellectual Property" under which NVID warranted that it was the sole and exclusive owner of all Axenohl patent rights and, as assignor, sold, assigned, transferred and set over to Pure Bioscience its entire right, title interest in and to all Axenohl patent rights that it possessed. As a result of the Core Settlement Agreement, Pure Bioscience became the sole and exclusive owner of all Axenohl patents, its diluted form Axen, all related technology and intellectual property, including all related trademarks.

In January 2003, Pure Bioscience and Nickel, Ltd. — a manufacturer and distributor of wet wipes in Europe — entered into a cross-marketing and licensing agreement entitled "Umbrella Agreement." Under the Umbrella Agreement, Pure Bioscience granted Nickel a license to use Axen in Europe for use in a hard surface disinfectant spray and wet wipes. The License Agreement is memorialized as Exhibit E to the Umbrella Agreement and is specifically incorporated into the Umbrella Agreement at § 7.12.

By way of an Omnibus Agreement dated September 12, 2003, NVID transferred to Falken all of its rights, title, and interest NVID had or may have against Pure Bioscience under the Core Settlement Agreement. NVID also transferred all of its rights to moneys due and to become due, and all claims, demands, and causes of action resulting of sales of products

---

[1] Citations to supporting documents have been omitted.

incorporating the Axenohl patent, and any derivative therefrom. NVID additionally transferred all of its rights, titles, and interests to moneys due and to become due, and all claims, demands, and causes of actions in any intellectual property relating to the Axnohl patent, Axen, and all derivatives thereof.

On October 27, 2003, Pure Bioscience submitted to the AAA in San Diego[2] a Statement of Claims for arbitration against, *inter alia*, NVID and Falken Industries, Ltd. Pure Bioscience alleged that it had learned through NVID's press releases that NVID had sold and assigned all of its interest in the Axenohl technology and patent to Falken. Pure Bioscience also alleged that NVID and Falken had disseminated a blizzard of false, misleading, and disparaging statements about Pure Bioscience on Yahoo!-maintained Internet bulletin boards and on a website known as "Raging Bull" and had violated several provisions in the Core Settlement Agreement. Falken allegedly claimed it owned the Axenohl patent and its derivatives and stated it had the right to Axen sales anywhere in Europe and the United States. Pure Bioscience alleged claims against NVID and others for failure to maintain corporate existence, failure to maintain sufficient asset base, and failure to maintain sufficient assets and capitalization to meet ongoing duties and responsibilities imposed by the Core Settlement Agreement. Pure Bioscience alleged a trade libel claim against NVID and Falken and requested declaratory and emergency relief.

On December 2, 2003, Arbitrator Jack F. Fitzmaurice conducted a preliminary hearing. Falken appeared specially for the limited purpose of objecting to AAA's jurisdiction over Falken on the ground Falken was not a signatory to the Core Settlement Agreement. Arbitrator Fitzmaurice and the parties reached agreement on a briefing schedule and hearing date regarding Falken's obligation to arbitrate. After the hearing, Arbitrator Fitzmaurice concluded Falken was subject to the arbitration clause on two separate grounds: (1) NVID's assignment to Falken its right, title, and interest in the Core Settlement Agreement; and (2) equitable estoppel. Arbitrator Fitzmaurice ordered Falken to answer or otherwise respond to Pure Bioscience's

---

[2] Article 18.1 of the Core Settlement Agreement provides that the American Arbitration Association ("AAA") of San Diego "shall maintain exclusive jurisdiction over any questions concerning the interpretation or enforcement of this Agreement and all of its component exhibits."

1  demand for arbitration within 10 days of the date of receipt of the decision.

2  After Arbitrator Fitzmaurice issued his preliminary hearing order but before he issued his
3  decision as to Falken's obligation to arbitrate, Falken and NVID entered into a Covenant to
4  Stand Seized. In this agreement, Falken and NVID rescinded the September 12, 2003 Omnibus
5  Agreement. The parties agreed that NVID would act as Falken's fiduciary and hold for the use
6  and benefit of Falken all rights, title, and interest in claims NVID had or may have against Pure
7  Bioscience as well as NVID's claims under the Core Settlement Agreement. NVID also agreed
8  to hold in trust for Falken all moneys due and to become due, and all claims, demands and
9  causes of action resulting from sales of products incorporating the Axenohl patent and any
10 derivative therefrom. Finally, NVID agreed to hold in trust for Falken all rights, titles, and
11 interests to moneys due and to become due, and all claims, demands, and causes of actions in
12 any intellectual property relating to the Axenohl patent, Axen, and all derivatives thereof.

13 On February 10, 2004, Falken filed an action in the United States District Court for the
14 Southern District of New York, seeking an injunction against AAA and Pure Bioscience from
15 proceeding with the arbitration against Falken. In so doing, Falken argued that the question of
16 whether a non-signatory to an arbitration agreement can be compelled to arbitrate must be
17 decided by the court, not the arbitrator. On March 18, 2004, Pure Bioscience and Falken entered
18 into a stipulation in the AAA proceedings providing that Falken would voluntarily dismiss the
19 New York action, and default judgment would not be entered against Falken in the arbitration
20 until after a court determination was made regarding whether Falken is properly a party to the
21 arbitration and the arbitrator has jurisdiction over Falken in connection with Pure Bioscience's
22 claims. On March 23, 2004, Falken voluntarily dismissed the New York action.

23 On June 9, 2004, Pure Bioscience commenced the prior action against Falken [04-CV-
24 1147-L(NLS)] and filed a Motion for Issuance of an Order Compelling Arbitration, citing 9
25 U.S.C. § 4. Pure Bioscience maintained Falken was bound by the arbitration clause and must
26 participate in the proceedings before Arbitrator Fitzmaurice. Falken moved to dismiss the case
27 for lack of personal jurisdiction. While the parties' motions were under submission, Arbitrator
28 Fitzmaurice proceeded with the arbitration as to Pure Bioscience's claims against NVID only.

1   NVID did not appear in the arbitration. Arbitrator Fitzmaurice granted Pure Bioscience's
2   request to strike NVID's Answer and Counterclaim and entered default against NVID. After
3   reviewing the evidence presented and Pure Bioscience's claims, the arbitrator entered an award
4   against NVID in Pure Bioscience's favor in the amount of $14.6 million.
5        This Court then entered an order on January 4, 2005 which granted Pure Bioscience's
6   petition to compel arbitration and denied Falken's motion to dismiss. The Court's decision
7   currently is pending before the Ninth Circuit Court of Appeals.
8        **2.    Petition for Order Compelling Nickel to Arbitration in this Litigation**
9        The Federal Arbitration Act ("FAA") permits a party "aggrieved by the alleged . . .
10  refusal of another to arbitrate" to petition a federal district court for an order compelling
11  arbitration. 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th
12  Cir. 2000). "The standard for demonstrating arbitrability is not high." *Simula, Inc. v. Autoliv,
13  Inc.*, 175 F.3d 716, 719 (9th Cir. 1999). "The Supreme Court has held that the FAA leaves no
14  place for the exercise of discretion by a district court, but instead mandates that district courts
15  direct the parties to proceed to arbitration on issues as to which an arbitration agreement has
16  been signed." *Id.* (*citing Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 218 (1985)); *accord
17  Chiron*, 207 F. 3d at 1130. Thus, the court's role is limited to determining "(1) whether a valid
18  agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute
19  at issue." *Chiron*, 207 F.3d at 1130.
20       Here, Pure Bioscience seeks to compel Nickel to AAA arbitration in San Diego county
21  based upon the Axen License Agreement and Article VII of the Umbrella Agreement. Nickel
22  opposes the petition by arguing that it is not subject to arbitration in California because the
23  Axen Licensing Agreement was not signed but was merely an exhibit to the Umbrella
24  Agreement and the Umbrella Agreement contains an arbitration clause providing for arbitration
25  in Sweden and specifically prohibits arbitration or legal proceedings in France or the United
26  States. Additionally, Nickel alleges that Pure Bioscience's claims do not arise out of the
27  Umbrella Agreement, but if the claims fell within the Umbrella Agreement, the claims are
28  subject to arbitration in Sweden and not the United States.

### A. Validity of the Agreement to Arbitrate

The Umbrella Agreement provides that in the event of

> [a]ny disagreement arising out of this Agreement whether sounding in tort or in contract, shall be submitted to binding arbitration conducting in the English language to be held in Stockholm, Sweden, under the International Arbitration Rules (effective November 1, 2001) of the American Arbitration Association.

(Exh. B, Umbrella Agreement at 33, § 10.21).

The Umbrella Agreement further provides that the courts of neither the United States nor France will have subject-matter jurisdiction over IMS or Nickel in the event of a disagreement arising out of the Umbrella Agreement. (Exh. B, Umbrella Agreement at 32, §§ 10.19, 10.20.)

But the Axen License Agreement provides in relevant part:

> The laws of the state of California govern this Agreement without reference to any conflict of laws provision(s). All disputes and controversies related to this Agreement and the transactions contemplated by this Agreement whether sounding in tort or contract shall be determined exclusively by binding mediation/arbitration ("med/arb") in accordance with the then current commercial dispute procedures of the American Arbitration Association, and will be conducted **only in the county of San Diego, California. . . . The Parties expressly submit to the jurisdiction of said San Diego arbitrator, and voluntarily waive any right to assertion of the principle of "inconvenient forum."**

(Exh. A, Axen License Agreement at 23). The Axen License Agreement is incorporated into the Umbrella Agreement at Section 7.12: "Annexed hereto at Exhibit 'E' us a copy of IMS' usual form of license agreement. Only to the extent that the same is not inconsistent with the provisions of Article VII herein such are usual standard conditions and terms incorporated herein by reference." (Exh. B, Umbrella Agreement at 23)

Pure Bioscience contends that Axen License Agreement is a legally executed "stand alone" agreement based on initials made by Nickel's Corporate Secretary/General Counsel, Emile Gouiran, and found on each page of the Axen License Agreement even though the license agreement is not signed by Gouiran. Additionally, Pure Bioscience argues that any inconsistencies between the incorporated language concerning dispute resolution in the Umbrella Agreement and the Axen License Agreement should be resolved in favor of the enforcement of the narrower provision or the arbitration provision in the narrower agreement which, in this case, is the Axen License Agreement

Nickel asserts that because Gouiran did not sign the Axen License Agreement on behalf of Nickel, rather each page of the agreement merely initialed, it is not valid or enforceable agreement. Nickel argues that initialing is not the equivalent of execution of the document by pointing out that each page of the Umbrella Agreement and its Exhibits, A– F, was initialed whether or not the page or the document was intended to be executed. According to Nickel, the documents that were intended to be executed, *i.e.*, the Umbrella Agreement and the two Super Distribution Agreements,³ were initialed and signed. Because Nickel did not execute the Axen License Agreement, even though Pure Bioscience executed the document and there was a line for Gouiran's signature on Nickel's behalf, the Axen License Agreement was not intended to be a binding and separate agreement.

Nickel also asserts that Article VII of the Umbrella Agreement does not anticipate the execution of a separate license agreement but rather the terms of the license are set forth in the Umbrella Agreement. Section 7.12 of the Umbrella Agreement provides that the Axen License Agreement, Exhibit E to the Umbrella Agreement, "is a copy of IMS' usual form of license agreement. Only to the extent that the same is not inconsistent with the provisions of Article VII herein, such as are usual standard conditions and terms are incorporated herein by reference." (Exh. B, Umbrella Agreement at 23, § 7.12.) The Umbrella Agreement is silent about the execution of the Axen License Agreement but execution of the two Super Distribution Agreements, also attached as exhibits to the Umibrella Agreement, is expressly provided for in the Umbrella Agreement: "Nickel will simultaneously with the signature of the present [Umbrella] Agreement and by separate Agreement, grant a super distribution on the Clean Plus line of products." *Id.* at 18, §6.1, *et seq.*

Nickel also argues that by providing for arbitration in California, the Axen License Agreement is inconsistent with the arbitration provision in Article VII of the Umbrella Agreement. Further, even if the Axen License Agreement could be considered valid, a clause

---

³ The Umbrella Agreement contains three sub-agreements, two of which are a Super Distributorship Agreement related to automotive products ("Carline") and a Super Distributorship Agreement related to janitorial products ("Jan/San").

calling for arbitration in the United States rather than Stockholm, Sweden is not a "gap-filling" provision that can be substituted into the Umbrella Agreement.

Pure Bioscience contends that because the Axen License Agreement concerns itself with the licensing and sale of goods, it is governed by the Uniform Commercial Code ("UCC") and its Statute of Frauds. (Reply at 3).[4] The concept of "signed" under the UCC is based upon a present intention to authenticate the writing: "any symbol executed or adopted by a party with present intention to authenticate a writing." UCC § 1-1201(39). Pure Bioscience notes that UCC § 2-201, Comment 39 provides:

> The inclusion of authentication in the definition of signed is to make clear that as the term is used in this Act a complete signature is not necessary. Authentication may be printed, stamped, or written; *it may be by initials* or thumbprint. It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead. No catalog of possible authentications can be complete and the court must use common sense and commercial experience in passing upon these matters. The question always is I*whether th symbol was executed or adopted by the party with present intention to authenticate the writing.*

Comment 39 (emphasis added).

Pure Bioscience provides the declaration of Gene Auerbach, the Chief Operating Officer of Pure Bioscience in which he sets forth the negotiations on the Axen License Agreement document. *See* Auerbach decl. at ¶¶ 8, 9 and 17-28, Auerbach's declaration makes clear that a separate, enforceable licensing agreement was necessary for the entire transaction to occur and that although it remained a point of disagreement between the parties up to and through the final month of negotiations, Nickel agreed to accept the Axen License Agreement as a separate sub-agreement to the Umbrella Agreement and on the equal footing with the Super Distributorship Agreements.

Pure Bioscience also notes that each of the Super Distributorship sub-agreements contains a dispute resolution provision that is different than that contained in the Umbrella Agreement. The two Super Distributor Agreements provide for dispute resolution in Paris, France, not Sweden as the Umbrella Agreement provides along with the prohibition against

---

[4] Although Pure Bioscience raises the issue of the UCC in its reply memorandum, Nickel has not attempted to address this argument in a supplemental filing.

arbitration in the United States and France. Nickel appears to accept that the dispute resolution provisions in the Super Distributorship sub-agreements can be harmonized with the Umbrella Agreement because it has commenced two legal actions against Pure Bioscience in France under the sub-agreements. Therefore, Pure Bioscience contends that it has always been Nickel's intention that the dispute resolution paragraphs in the sub-agreements remain independent of the no United State and no France venue prohibition provisions of the Umbrella Agreement. Pure Bioscience contends that Nickel should be estopped to assert a contrary position against Pure Bioscience here. Court agrees and Nickel is estopped from arguing that the disputes arising under the license agreement must be arbitrated in Sweden.

Based on the evidence presented by the parties, much of it undisputed, the Court finds and concludes that the Axen License Agreement was intended to be a separate licensing agreement that was executed by the parties. Further, the Axen License Agreement venue provision providing for arbitration in San Diego is a valid term within the licensing agreement and does not conflict with the arbitration provision in the Umbrella Agreement.

### B.    Scope of the Claims

Pure Bioscience contends that its asserted claims conform specifically to the Axen License Agreement which is narrower in scope than the Umbrella Agreement. Although Nickel argues that the Axen License Agreement is not valid, it appears to agree with Pure Bioscience that the claims asserted are not consistent with claims that could be considered as included in Article VII of the Umbrella Agreement and thus subject to arbitration in Sweden: "the terms the Pure Bio seeks to enforce <u>in</u> arbitration, are radically different from those included in Article VII." (Opposition at 6 (emphasis in original)).

Because the claims Pure Bioscience seeks to have arbitrated fall within the scope of the Axen License Agreement, and the Court has found that the Axen License Agreement is separately enforceable and the arbitration clause providing for arbitration in San Diego is valid, the Court concludes that Nickel is subject to arbitration in San Diego.

### Conclusion

Based on the foregoing, **IT IS ORDERED** granting Pure Bioscience's petition for order

compelling Nickel to arbitration. **IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment in accordance with this Order.

**IT IS SO ORDERED.**

Dated: 9/30/05

M. JAMES LORENZ
UNITED STATES DISTRICT JUDGE

COPY TO:

HON. NITA L. STORMES
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL